[Cite as *State v. Carradine*, 2015-Ohio-3670.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 101940**

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# ROBERT CARRADINE

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-14-585041-A

**BEFORE:** Keough, P.J., E.A. Gallagher, J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:** September 10, 2015

**ATTORNEY FOR APPELLANT**

Joseph V. Pagano
P.O. Box 16869
Rocky River, Ohio 44116

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
By: Owen M. Patton
Assistant Prosecuting Attorney
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

KATHLEEN ANN KEOUGH, P.J.:

{¶1} Defendant-appellant, Robert Carradine, appeals his convictions and sentence. For the reasons that follow, we affirm.

{¶2} In May 2014, Carradine was named in a seven count indictment for his involvement in a robbery of a corner store on Cleveland's east side. He was charged with aggravated robbery, robbery, aggravated burglary, burglary, and felonious assault. These five offenses included both one- and three-year firearm specifications. Carradine was also charged with carrying a concealed weapon and a having weapon while under disability. All seven charges carried a specification for forfeiture of the firearm involved. Carradine elected to bifurcate the carrying a concealed weapon and having a weapon while under disability counts, trying those charges to the bench. The remaining counts were tried to the jury where the following relevant evidence was presented.

{¶3} In the early evening of April 16, 2014, Joel Latimore was tending his corner store on Coit Road and Idarose Avenue while talking to two regular patrons who were sitting in the store. Latimore was sitting behind the counter when a young male, later identified as Carradine, walked into the store and stood back by the soda pop cooler. About two seconds later, another young male walked into the store, approached the counter, pointed a gun at Latimore's head, and said "You know what it is." Latimore reacted by hitting the male's hand with such force that the male fell to floor. Latimore

then fired his .38 revolver at the gunman. Whether the bullet struck the gunman is unknown, but he got up off the floor and fled.

{¶4} After hearing his patron, Woodward Hunt, accuse Carradine of being with the gunman, Latimore ordered Carradine, by gunpoint, to lay on the ground. Carradine repeatedly denied being with the other male and complied with Latimore's order. Latimore then ran outside to look for the male. When he came back inside, he noticed that Carradine had left the store. Latimore then called the police. The dispatch recording was played for the jury.

{¶5} Mizell Mahoney testified that he lives diagonally across from the corner store. He told the jury that he was upstairs in his house when he heard the sound of a gunshot. When he looked out of the window, he saw two men running from the store. He called the police and described to the dispatcher that both of the men were black males, one wearing all black with a black hooded sweatshirt and the other wearing a green hooded sweatshirt. The jury listened to the recording of Mahoney's 911 call.

{¶6} Officer Daniel McCandless testified that he responded to the area for an initial call of two men shooting at each other. He received the descriptions of the males by dispatch. While in route, he saw a male, later identified as Carradine, fitting one of the descriptions he received, emerging from behind a closed daycare. Officer McCandless testified that when he approached Carradine, he observed a shiny object in Carradine's sweatshirt pocket. Believing that the object was a gun, he ordered Carradine

to the ground. Officer McCandless recovered a silver handgun from Carradine's sweatshirt pocket and placed him under arrest.

{¶7} Officer McCandless took Carradine back to the corner store because he received a subsequent call about an attempted robbery and Carradine matched the description of one of the suspects. Officer McCandless conducted a cold stand identification with Latimore, Hunt, and the female patron. Each of them positively identified Carradine as the first male that came into the store before the gunman. Based on Carradine's clothing, Mahoney identified him as one of the males he saw running from the beverage center.

{¶8} Detective Jarod Schlacht testified that he was assigned to the case. As part of his investigation, he interviewed witnesses and toured the crime scene and surrounding areas for evidence and clues because the gunman had not been apprehended or identified.

{¶9} Additionally, he interviewed Carradine which was audio recorded. The recording was played for the jury who heard Carradine deny his involvement with the robbery. During the interview, Carradine maintained that he did not know the gunman but that he merely went into the store and walked back by the cooler. He stated that a black male who had the hood from his sweatshirt pulled tightly around his head was following him. It was this male that followed him into the store and pulled a gun on the cashier. However, the jury heard a subsequent recorded interview with Carradine who then admitted that he knew the gunman as "Little Bro," but still maintained that he did not know that Little Bro was going to rob the store. Carradine supplied identifying

information about Little Bro. However, Detective Schlacht testified that he was unable to locate or identify Little Bro based on the information received.

{¶10} Carradine testified in his defense. He admitted that he had a prior criminal record but that he wanted to testify because he was in the wrong place at the wrong time when Little Bro committed the robbery. He told the jury that he did not know that Little Bro was going to rob the corner store and denied participating in the robbery. Carradine testified that after playing basketball, he put his handgun in his waistband and was walking home when Little Bro came running up behind him and they walked up the hill together. While walking, Little Bro asked him if he had his gun on him. Carradine responded that he did. Carradine testified that he carried a gun on him at all times for protection even though he knew that it was illegal for him to carry a gun.

{¶11} After telling Little Bro that he had his gun on him, Carradine told him that he was going into the corner store. According to Carradine, Little Bro responded, "[o]h, yeah, you go in the store first." Carradine testified that he responded, "[o]kay, I'll go."

{¶12} Carradine initially testified that he walked into the store toward the back cooler and when he turned around, he saw Little Bro with a gun pointed at the cashier. Later he testified that he heard the gunshot first before turning around. Carradine testified that when he was on laying the floor, he told Latimore that he just got off of parole and put his identification on the floor. According to Carradine, he left the store because Hunt told him to get up off the floor and that he knew that he illegally had a gun on him.

{¶13} Carradine testified that after he left, he thought about abandoning the gun because he knew if he was stopped for questioning, he would be arrested. As he started to unload it, he realized he was close to home and thought he would be able to make it home undetected. However, Officer McCandless spotted him, searched him, discovered the gun, and he was arrested.

{¶14} The jury returned a verdict of guilty on all counts, including all the attendant specifications; the court found Carradine guilty of carrying a concealed weapon and having a weapon while under disability, including the attendant forfeiture specification. The court found that Counts 1 through 5 (aggravated robbery, robbery, aggravated burglary, burglary, and felonious assault) merged for sentencing purposes, with the state electing that Carradine be sentenced on the aggravated robbery count, Count 1. The court also found that all firearm specifications merged. Therefore, the court ordered Carradine to serve the three-year firearm specification in Count1 prior and consecutive to the four year sentence on Count 1, for a total sentence of seven years. The court also ordered Carradine to serve 18 months on Count 6, carrying a concealed weapon; and 36 months for Count 7, having a weapon while under disability. Counts 6 and 7 were ordered to run concurrently to each other and to the seven-year sentence on Count 1.

{¶15} Carradine now appeals, raising four assignments of error, which will be addressed out of order.

I. Sufficiency of the Evidence

{¶16} In his first assignment of error, Carradine contends that his convictions for Counts 1 though 5 were not supported by sufficient evidence and the trial court erred by denying his motions for acquittal.

{¶17} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶18} Carradine first challenges his convictions for aggravated robbery, robbery, aggravated burglary, burglary, and felonious assault by arguing that there was insufficient evidence to sustain his convictions under an aiding and abetting theory. He maintains that the evidence established that he was merely present which, under Ohio law, is insufficient.

{¶19} In this case, the state proceeded under a theory of aiding and abetting. Ohio's complicity statute, R.C. 2923.03(A), provides that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * aid or abet another in committing the offense." "A person aids or abets another when he supports,

assists, encourages, cooperates with, advises, or incites the principal in the commission of the crime and shares the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Seals*, 8th Dist. Cuyahoga No. 101081, 2012-Ohio-517, ¶ 34, citing *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001). Aiding and abetting may be shown by both direct and circumstantial evidence, and participation may be inferred from presence, companionship, and conduct before and after the offense is committed. *State v. Cartellone*, 3 Ohio App.3d 145, 150, 444 N.E.2d 68 (8th Dist.1981), citing *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971); *see also State v. Harmon*, 8th Dist. Cuyahoga No. 53221, 1988 Ohio App. LEXIS 629 (Feb. 18, 1988).

**{¶20}** "The mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor." *State v. Widner*, 69 Ohio St.2d 267, 269, 431 N.E.2d 1025 (1982). This rule protects innocent bystanders who have no connection to the crime other than simply being present at the time of its commission. *Johnson* at ¶ 245.

**{¶21}** Viewing the evidence in the light most favorable to the state, sufficient evidence was presented to support Carradine's convictions under an aiding and abetting theory. The jury heard Carradine admit that he was walking with the gunman prior to going into the store. During this time, Little Bro confirmed with Carradine that Carradine had his gun on his person. When he walked into the store, he walked back to the cooler. According to Latimore, Carradine stood there looking at him and then the

gunman entered the store and pointed the gun at him. Hunt, who frequents the store everyday, testified that at first he did not think the two men were together but he suspected they were together because it was uncommon for two strangers to walk into the store moments apart and then "something like that happens." (Tr. 250.) Additionally, the jury heard that after the gunman fled, Carradine also left the scene, running in the same direction as the gunman. When Carradine was apprehended by the police, he had a loaded firearm and a right-handed glove on his person. The jury heard sufficient evidence to support Carradine's convictions under an aiding and abetting theory.

{¶22} Carradine also contends that the state failed to present sufficient evidence as to the "trespass" and "occupied structure" elements that are necessary for a conviction of aggravated burglary and burglary.

{¶23} Contrary to Carradine's argument, the corner store qualifies as an "occupied structure." R.C. 2909.01(C) defines an "occupied structure" as "any * * * building * * * to which any of the following applies: * * * (4) At the time, any person is present or likely to be present in it." Because the business was open to the public during normal business hours when the crime occurred, it is without questions that the corner store qualifies as an occupied structure under the law.

{¶24} Furthermore, Carradine contends that the burglary conviction also fails because the store was open to the public when the incident occurred, thus he could not have trespassed on the property to satisfy that element of offense of burglary. R.C. 2911.21(A) defines criminal trespass as, "[n]o person, without privilege to do so, shall do

any of the following: (1) [k]nowingly enter or remain on the land or premises of another * * *." "Privilege is the distinguishing characteristic between lawful trespass and unlawful presence on the land or premise of another." *State v. Russ*, 12th Dist. Clermont No. CA99-07-074, 2000 Ohio App. LEXIS 2759, *8 (June 26, 2000). "'Where no privilege exists, entry constitutes trespass.'" *Id.*, quoting *State v. Lyons*, 18 Ohio St.3d 204, 206, 480 N.E.2d 767 (1985). "Privilege is 'an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity.'" *Russ* at *8, quoting R.C. 2901.01(A)(12).

{¶25} In support of his argument, Carradine cites to *State v. Barksdale*, 2 Ohio St.3d 126, 443 N.E.2d 501 (1983), where the Ohio Supreme Court held that it would not extend the breaking and entering statute to cover a situation in which Barksdale, being lawfully on a car lot after the lot had closed, entered vehicles on the lot and committed theft offenses. Barksdale had appealed his conviction on grounds that the state failed to prove the lack of privilege element of trespassing because the car lot was open to the public at the time he committed the offenses. The court reasoned that extending the breaking and entering laws to apply to Barksdale would result in a shoplifter being "liable for breaking and entering, his felonious purpose — shoplifting — having vitiated his privilege to enter the store, a privilege enjoyed by the general public." (Footnote omitted.) *Id.* at 128. Noting that thousands of criminals could be charged with burglary under such circumstances, it found that the "[t]he General Assembly clearly did not intend such a radical and unwarranted extension of the breaking and entering statute." *Id.*

**{¶26}** This court applied and followed *Barksdale* in *State v. Whitfield*, 8th Dist. Cuyahoga No. 71650, 1997 Ohio App. LEXIS 4648 (Oct. 16, 1997), where this court reversed the defendant's convictions for breaking and entering because the defendant did not trespass into a public park during the hours it was open to the public. Even though the defendant committed a theft offense while on the property, the defendant's entry on the property was lawful and privileged.

**{¶27}** However, the holding in *Barksdale* has been narrowed twice by the Ohio Supreme Court, initially in *Lyons*, 18 Ohio St.3d 204, 480 N.E.2d 767, then again in *State v. Steffen*, 31 Ohio St.3d 111, 509 N.E.2d 383 (1987).

**{¶28}** In *Steffen*, the Supreme Court upheld an aggravated burglary conviction by finding that Steffen's permission to enter the victim's house had been terminated once he began his assault on the occupants of the house. Noting that *Barksdale* involved a public car lot as opposed to the private home scenario in *Steffen*, the court stated: "The interest of a private person in the inviolability of his home is materially greater than that of a business owner in his business premises, particularly where the business premises are open to the public." *Id*. at 115.

**{¶29}** The state maintains that the case against Carradine is more closely related to the facts in *Steffen*; thus, once the gunman committed an offense of violence, any privilege he had was revoked.

**{¶30}** The Eleventh District tackled this issue in *State v. May*, 11th Dist. Lake No. 2010-L-131, 2011-Ohio-5233. In *May*, the defendant entered a cash advance store

during business hours, brandished a weapon at a customer, and demanded money. The court distinguished *Barksdale* by stating that the moment the defendant brandished the weapon and demanded money, the defendant's privilege to remain in the store was terminated.

{¶31} We agree with our colleagues in the Eleventh District. As the Ohio Supreme Court noted in *Steffen*, "a privilege once granted may be revoked. In [*Steffen*], unlike in *Barksdale*, the felony committed, once on the premises, was one of violence, directed against a human being who had the ability and the authority to revoke the privilege of initial entry * * * ." *Steffen* at 115.

{¶32} Accordingly, we find that once the gunman committed an offense of violence by pointing the gun at the cashier, who was the owner of store, the privilege to remain in the store was terminated. The revocation of privilege extends to Carradine, under the aiding and abetting theory. Therefore, viewing the evidence in the light most favorable to the prosecution, sufficient evidence was presented supporting Carradine's convictions for Counts 1 through 5. The assignment of error is overruled.

## II. Manifest Weight of the Evidence

{¶33} In his second assignment of error, Carradine contends that his convictions were against the manifest weight of the evidence.

{¶34} "A manifest weight challenge * * * questions whether the prosecution met its burden of persuasion." *State v. Ponce*, 8th Dist. Cuyahoga No. 91329, 2010-Ohio-1741, ¶ 17, citing *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356

(1982).  The manifest weight of the evidence standard of review requires us to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  *State v. Otten*, 33 Ohio App.3d 339, 515 N.E.2d 1009 (9th Dist.1986), paragraph one of the syllabus.  The discretionary power to grant a new trial should be exercised only in exceptional cases where the evidence weighs heavily against the conviction.  *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶35} Carradine argues that his testimony established that he did not aid or abet Little Bro in robbing the store but that, at best, the state offered evidence of mere association and presence, which is not enough to sustain the convictions.

{¶36} After review, we find that Carradine's convictions were not against the manifest weight of the evidence.  The fact that Carradine provided the factfinder with an alternate version of the events does not automatically lead to the conclusion that his convictions were against the manifest weight of the evidence.  The jury, as factfinder, was able to listen to each witness presented and judge their respective credibility.  The factfinder was within its province to discredit Carradine's testimony, especially when he initially denied having any knowledge about the gunman.  *See, e.g., State v. Howard*, 4th Dist. Ross No. 07CA2948, 2007-Ohio-6331, ¶ 16.

{¶37} The jury heard Carradine admit that he was walking with Little Bro when Little Bro asked him if he had his gun on him. He further acquiesced when Little Bro told him to go into the store first. Finally, although Latimore initially felt that they were not together when Carradine and Little Bro walked into the store, after the events that occurred coupled with the fact that they were two strangers coming into the store, Latimore and Hunt both believed they were together.

{¶38} Furthermore, the jury was given an instruction about mere presence and association with the perpetrator as not being sufficient evidence under an aiding and abetting theory. Therefore, the jury was able to determine from the evidence if Carradine was a participant in the offense. *See State v. Woodard*, 68 Ohio St.3d 70, 74, 623 N.E.2d 75 (1993) ("[W]e assume that the jury was able to follow the proper instructions of the court").

{¶39} Finally, Carradine's assertions that inconsistent testimony was given does not warrant reversal here. The jury heard the 911 call made by Mahoney at the time of the offense. The jury heard Mahoney describe two young black males running from the area after hearing a shot fired. Mahoney told dispatch that he believed that the two males were shooting at each other. At the time, Mahoney knew nothing about the robbery at the store. Clearly, he saw two men running from the store and he stated that the second male (Carradine) was trying to catch up to the first male. This observation is consistent with Latimore's testimony that the gunman exited the store first and when Latimore went to locate the gunman, Carradine got up and fled the store. Mahoney's inconsistency of

where he was when he saw the males running is not of importance. Based on Mahoney's description, Officer McCandless was able to locate and apprehend Carradine.

{¶40} Accordingly, this is not the "exceptional case in which the evidence weighs heavily against the conviction" such that a new trial should be ordered. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. Carradine's second assignment of error is overruled.

### III. Jury Instruction

{¶41} In his fourth assignment of error, Carradine contends that it was plain error and violated due process when the trial court instructed the jury on revocation of privilege to be on residential premises where the record establishes that Carradine was lawfully on public property during normal business hours.

{¶42} At the request of the state, the court gave an instruction

> Where a defendant lawfully entered a *residential* premises, the privilege to be in or upon those premises can be inferred to have been revoked where the defendant thereafter committed a violent felony directed against another person in the premises who had the ability and authority to revoke the privilege.

(Emphasis added.) Tr. 438-439.

{¶43} Because Carradine failed to object to the manner in which the court gave the jury instructions, plain error must be found to reverse his convictions and for a new trial to be ordered. Crim.R. 30(A). Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.* at paragraph three of the syllabus; Crim.R. 52(B).

{¶44} Plain error does not exist in conjunction with improper jury instructions unless the defendant proves that the outcome of the trial would clearly have been different. *State v. Cooper*, 170 Ohio App.3d 418, 2007-Ohio-1186, 867 N.E.2d 493, ¶ 31, (4th Dist.), citing *State v. Williford*, 49 Ohio St.3d 247, 253, 551 N.E.2d 1279 (1990); *State v. Sanders*, 92 Ohio St. 3d 245, 263, 750 N.E.2d 90 (2001); *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus.

{¶45} The instruction challenged on appeal was an extra instruction that was not necessary because, as previously discussed under Carradine's first assignment of error, Carradine did not enter a residential premises. Even so, we determined that the same concept of revocation of privilege applies when, although lawfully on a public premises, once a crime of violence occurs, that privilege is implicitly revoked.

{¶46} Moreover, when viewing the jury instructions as a whole, as we must do, we find that the jury was properly instructed on all the elements of aggravated burglary and burglary. Therefore, we find no plain error with the inclusion of this additional instruction; the outcome of Carradine's trial would not have been different if the instruction was not included. Accordingly, Carradine's fourth assignment of error is overruled.

IV. Allied Offenses

{¶47} In his third assignment of error, Carradine contends that the trial court failed to merge all allied offenses of similar import and by imposing separate sentences for

allied offenses, which violates his state and federal rights to due process and protections against double jeopardy.

{¶48} Carradine contends that Count 6, carrying a concealed weapon, and Count 7, having a weapon while under disability, are allied offenses and should have merged for sentencing. Carradine objected to the imposition of separate sentences for these offenses; thus, we review this assignment of error under a de novo standard of review in reviewing a trial court's R.C. 2941.25 merger determination. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28.

{¶49} It is unclear whether Carradine is also claiming that the firearm specifications merge with Counts 6 and 7. Assuming he is, the argument is without merit. Firearm specifications are not allied to the underlying crimes because the specification itself is not a criminal offense, but a penalty enhancement. *State v. Swiergosz,* 197 Ohio App.3d 40, 2012-Ohio-830, 965 N.E.2d 1070, ¶ 44 (6th Dist.). Here, since the specifications are not offenses, the court did not err in failing to merge the specifications with the offenses.

{¶50} R.C. 2941.25 provides that

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

**{¶51}** In *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, the Ohio Supreme Court created a two-part test to determine if offenses should merge. The first prong requires that the court determine if the multiple offenses "were committed by the same conduct." *Id*. at ¶ 47. The second prong is whether "it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other." *Id*. If both of these questions are answered affirmatively, then the offenses should merge.

> [I]f the court determines that the commission of one offense will never result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge.

*Id*. at ¶ 51.

**{¶52}** Recently, in *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, the Supreme Court of Ohio clarified how courts are to determine whether offenses are allied. The Supreme Court noted that the allied-offenses analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct. *Id.* at ¶ 26. Nevertheless, conduct is but one factor to consider when determining whether offenses are allied. *Id.* at ¶ 21. The court explained:

> As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.

*Id.* at ¶ 31.

**{¶53}** With respect to import, the Supreme Court explained that offenses are of dissimilar import "if they are not alike in their significance and their resulting harm." *Id.* at ¶ 21. Thus, "two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at ¶ 26.

**{¶54}** The Supreme Court noted in *Ruff* that the evidence at trial or during a plea or sentencing hearing will reveal whether the offenses have similar import. *Id.*

**{¶55}** Carradine contends that the carrying concealed weapon and having weapons while under disability convictions were committed by the same conduct, with a single animus — possessing the handgun.

**{¶56}** It is possible to commit the offenses of carrying a concealed weapon and having a weapon while under disability with the same conduct. R.C. 2923.12(A)(2), carrying concealed weapons, prohibits a person from knowingly carrying or having, concealed on the persons' person or concealed ready at hand, a handgun. R.C. 2923.13(A)(2), having weapons under disability, prohibits a person who is under indictment or has been convicted of any felony of violence, from knowingly acquiring, having, carrying, or using any firearm or dangerous ordnance. Accordingly, it is certainly possible to commit both carrying a concealed weapon and having a weapon

while under disability with the same conduct. However, we must determine whether the two offenses were in fact committed with a separate animus.

{¶57} In *State v. Rice*, 69 Ohio St.2d 422, 433 N.E.2d 175 (1982), syllabus, the Ohio Supreme Court held that the crimes of carrying a concealed weapons and having weapons while under disability are not allied offenses of similar import and may be committed separately and with a separate animus. Recent courts, including this court, have continued to apply the *Rice* reasoning even after the decision in *Ruff* and *Johnson* where we are to look at the defendant's conduct. This court in *State v. Street*, 8th Dist. Cuyahoga No. 102096, 2015-Ohio-2520, and the Tenth District in *State v. Hobbs*, 10th Dist. Franklin No. 14AP-225, 2015-Ohio-2419, held that *Ruff* does not change the rationale or validity of *Rice* and its progeny because *Ruff* still prohibits merger if the offenses are committed with separate animus. *Hobbs* at ¶ 35, citing *Ruff* at ¶ 31; *Street* at ¶ 15.

{¶58} Applying the facts and viewing Carradine's conduct in this case, the offenses of carrying a concealed weapon and having weapons while under disability were committed with a separate animus. Carradine testified that he acquired and carried the gun with him at all times for protection even though he knew it was illegal for him to have the handgun due to his prior felony conviction. The acquisition of the firearm was done with a separate animus than the actual carrying of the handgun in a concealed manner on the day of his arrest. Therefore, the conduct of carrying his gun into the store

as a concealed weapon was done with a separate animus than the underlying motivation in acquiring a gun, thus having a weapon while under disability.

**{¶59}** Carradine's third assignment of error is overruled.

**{¶60}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

KATHLEEN ANN KEOUGH, PRESIDING JUDGE

EILEEN A. GALLAGHER, J., CONCURS;
SEAN C. GALLAGHER, J., CONCURS IN JUDGMENT ONLY
(SEE SEPARATE OPINION)

SEAN C. GALLAGHER, J., CONCURRING IN JUDGMENT ONLY:

**{¶61}** It may be time that the legislature considers completely rewriting R.C. 2941.25. The current form has, at best, proven difficult to interpret and to uniformly apply to similar fact patterns. The major issue with the statute is the use of

undefinable terms such as "allied offenses," "similar import," and, the most bedeviling of terms, "animus." Although various courts have attempted to provide definitions over the years, none have led to a lasting approach.

{¶62} Although I agree with the majority's result based on precedent from this district, I must write separately to clarify the allied offense analysis used to dispose of the third assignment of error and to attempt to provide a clearer road map of the analysis moving forward.

{¶63} Courts struggle with the application of the conduct-based analysis originating in *State v. Johnson*, trying to cram all merger issues into the *Johnson* test. *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061. The majority's attempt to reconcile the separate animus conclusion from *State v. Street*, 8th Dist. Cuyahoga No. 102096, 2015-Ohio-2520, with the facts of this case is telling. In *Street*, the panel concluded that possessing a gun was committed with a separate animus from concealing it, after seemingly dismissing the state's claim that separate acts resulted in each offense. *Id.* at ¶ 15. According to the facts in *Street*, there were two acts, possession and then a later concealment, but the panel concluded that possessing the gun and placing it in concealment was a single act committed with a separate animus. This creates confusion and the potential for disparate results, such as in the current case where only a single animus is demonstrated in the record (carrying the weapon for self-defense).[1]

---

[1]In a rare revelation, Carradine testified and stated his immediate intent,

{¶64} Although I ultimately conclude that Carradine's conduct in committing both offenses is outcome determinative, it must be emphasized that courts generally overlooked the fact that conduct is but one aspect of merger, and therefore, courts must be wary of an overwrought reliance on conduct-based analysis from *Johnson*. *See State v. Anthony*, 8th Dist. Cuyahoga No. 101847, 2015-Ohio-2267, ¶ 69 (S. Gallagher, J., dissenting) (legislative intent controls the merger analysis in certain circumstances involving crimes dependent on an underlying predicate offense because R.C. 2941.25 is not the only mechanism to resolve the merger issue pursuant to *State v. Miranda*, 138 Ohio St.3d 184, 2014-Ohio-451, 5 N.E.3d 603). In this case, there is no need to arbitrarily deem Carradine's violation of the carrying a concealed weapon ("CCW") and the having a weapon while under disability ("HWWUD") laws to be committed with a separate animus. There is evidence that Carradine had the same motivation, self-defense, behind acquiring and carrying the handgun. Finding a separate animus existed is difficult in this case, but determining whether separate conduct resulted in the two offenses is relatively simple. Carradine committed two crimes with separate conduct. His motivation is irrelevant.

---

motivation, or purpose for acquiring and carrying the handgun was for self-defense. This highlights the need to distinguish cases where a single act underlies the violation of two or more offenses from cases in which separate conduct does the same. If courts ignore the separate conduct and jump straight to determining whether the offender had a separate animus for each violation, cases like this become difficult and create murky case law.

**{¶65}** The Ohio Supreme Court held, in the context of interpreting R.C. 2941.25, that

> the offenses cannot merge and the defendant may be convicted and sentenced for multiple offenses: (1) [if] the offenses are dissimilar in import or significance — in other words, each offense caused separate, identifiable harm [or was committed against separate victims], (2) [if] the offenses were committed separately, [or] (3) [if] the offenses were committed with separate animus or motivation.

*State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 8924, ¶ 25. The merger analysis was stated in the disjunctive: any one of the factors warrants separate punishment. Further, for the ease of discussion, any reference to dissimilar import must necessarily include the concepts of separate identifiable harms and separate victims. Accordingly, courts must distinguish cases in which the merger analysis is based on separate conduct from those involving offenses committed with the same conduct but with a separate animus (motivation or intent) or crimes of dissimilar import (separate harms or separate victims). If committed with separate conduct, the offenses will not merge for sentencing and no further analysis — using the *Johnson* separate animus inquiry or the *Ruff* dissimilar import analysis — is necessary.

**{¶66}** The Ohio Supreme Court's analysis in *Johnson* supports this conclusion. The court held that if (1) it was possible to commit the offenses to be merged with the same conduct, and if (2) the offenses were actually committed by the same conduct, i.e., a single act committed with a single state of mind (animus), then the offenses must merge. *Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, at ¶ 47-49. Thus, the threshold question in any merger analysis is whether the offenses were committed with the same conduct.

If the answer to that question is no, then the offenses do not merge and any further merger discussion becomes superfluous.

**{¶67}** It must be remembered that a violation of the CCW statute is found if an offender knowingly carries a concealed weapon, and a violation of the HWWUD statute is found if the offender knowingly acquires, has, carries, or uses a firearm. Thus, the only overlapping conduct between the two statutes is "carrying" a concealed firearm. Acquiring, having, or using a firearm will not likely constitute a violation of the CCW statute in and of itself. As a result, although it is possible to commit the CCW and HWWUD violations with the same conduct, i.e., if both were committed by only carrying a firearm, the trial court in this case determined otherwise. As the state argued and the trial court accepted, the defendant's conduct in *acquiring* the handgun was separate from his conduct in *concealing and carrying* the firearm into the store. As a result, we need not delve into the defendant's animus (*Johnson*) or whether the crimes were of dissimilar import (*Ruff*); the conduct in acquiring the firearm for the purposes of the HWWUD charge was completely separate from his conduct in concealing and carrying that same weapon in public, which was the basis of the CCW violation.

**{¶68}** Conceivably, when confronting the merger question with regard to CCW and HWWUD charges in the future, it is possible that the act of acquiring the weapon is so close in time to the conceal-carry conduct as to constitute a single act as contemplated in *Johnson*. In this situation, however, as a means of objectively identifying separate conduct, some courts have determined that if one offense is completed before the other

begins, two offenses have been committed. *State v. Fields*, 12th Dist. Clermont No. CA2014-03-025, 2015-Ohio-1345, ¶ 18. Unless the offender simultaneously places the acquired weapon into concealment, the HWWUD acquisition is almost always going to be complete before the conceal-carry begins. This is not to mean a bright-line test exists, as the Ohio Supreme Court has doggedly avoided, it is merely a practical observation: one cannot conceal and carry what was not first acquired. Nonetheless, there could be rare factual situations in which the CCW and HWWUD are committed through a single act, in which case the animus inquiry is necessary.

{¶69} Noticeably absent from the foregoing analysis is any discussion of dissimilar import, which incorporates the concepts of separate victims or separate harms and legislative intent, as identified in *Miranda*, in the resolution of the merger issue in this case. These concepts provide alternative tests to determine whether offenses should merge. In the effort to provide a more thorough framework, it bears noting that if the offender's conduct results in the commission of multiple offenses, he still can be convicted of both if the crimes were of dissimilar import.

{¶70} In *Ruff*, the Ohio Supreme Court provided two alternatives to determine whether the offenses are of dissimilar import: separate victims or separate harms. The separate victims concept is simple enough; however, the separate harms principle may prove more difficult. In the First District's second attempt to merge Ruff's sentence, the court intimated that although a "blow by blow" analysis was shunned by the *Johnson* decision (which is not a majority decision, the majority of the court concurring in

judgment and the syllabus only), the state did not argue that any of the violent acts leading to the rapes constituted the separate harm underlying the aggravated burglary charge. *State v. Ruff*, 1st Dist. Hamilton Nos. C-120533 and C-120534, 2015-Ohio-3367, ¶ 19-20 ("*Ruff II*"). I believe this misses the point of the separate-harm concept altogether. As I have previously stated, and continue to adhere to,

> It cannot be overlooked that the crimes at issue in *Ruff* were aggravated burglary, in violation of R.C. 2911.11(A)(1), and rape, in violation of R.C. 2907.02(A)(2), both of which are conduct-based crimes. Aggravated burglary is committed if the offender trespasses into an occupied structure when another is present with the purpose of committing any criminal offense inside the structure and a harm (attempted or threatened) is inflicted. It is the intent to commit any criminal offense, coupled with a resulting harm and the conduct constituting the trespass, that signifies the commission of the burglary, although the real harm of which could be described as the invasion into the sanctity of the home. The crime of rape is meant to punish for the invasion of the sanctity of one's own body. In merging the offenses, the appellate court in *Ruff* failed to consider the dissimilar import of the two crimes and the Ohio Supreme Court reversed. [*Ruff*] at ¶ 28.

> [Contrary to the First District's *Ruff II* split decision, it] is of little consequence that the harm is actually inflicted through the commission of the offense that the offender intended to commit upon entering the structure. One way to look at this is that if one offense is completed before the other begins, two offenses have been committed. *State v. Fields*, 12th Dist. Clermont No. CA2014-03-025, 2015-Ohio-1345, ¶ 18. That analysis does not work in all situations because, as in *Ruff*, the aggravated burglary is not "complete" until a harm is actually caused. This likely led to the rejection of the all-or-nothing approach the state offered in *Ruff*. When looking at the situation posed in *Ruff*, however, a rape occurring in the sanctity of one's home should be separately punishable. To hold otherwise would treat a rape occurring outside the home (which is bad enough) the same as if it occurred in the presumed safety of the victim's home. Aggravated burglary and rape are both felonies of the first degree, and the merger results in the conviction of one offense. The legislature must have intended otherwise, or burglary would not be a separately delineated crime.

*Anthony*, 8th Dist. Cuyahoga No. 101847, 2015-Ohio-2267, ¶ 72-73 (S. Gallagher, J., dissenting). For aggravated burglary, no crime need actually be committed if the offender criminally trespasses with the intent to commit a criminal offense and inflicts physical harm on another. The crime of rape does not require physical harm, and therefore, the two crimes are of dissimilar import.

{¶71} The Third District recently came to a conclusion that was the opposite of the *Ruff II* court's conclusion. In *State v. Brown*, 3d Dist. Seneca No. 13-15-06, 2015-Ohio-3402, the defendant invaded the home of two victims, beat one with a tire iron and shot the other in the leg, leading to her death. The defendant was convicted of aggravated burglary, aggravated robbery, and murder with a gun specification. The court concluded that the defendant committed each act separately and with a separate animus despite the fact the crimes occurred within a short timespan during a single home invasion. It seems it would have been far simpler to determine that the aggravated robbery (hitting one victim with a tire iron for the purpose of robbing him) and murder charges (shooting the other victim in the leg leading to her death) were of dissimilar import because of the separate victims analysis pursuant to *Ruff*. Further, because the aggravated burglary harm is really the home invasion, it was a separate identifiable harm. Arguably, the Third District's conclusion conflicts with *Ruff II*, in that in one case the convicted offender faces multiple sentences, whereas in the other the offender faces only one sentence.

**{¶72}** Nevertheless, in this case, there are no ostensible victims or separate identifiable harms to violations of the CCW and HWWUD statutory sections. Both crimes are aimed at preventing future victims by limiting those who can possess weapons or who can carry concealed weapons. The dissimilar import discussion is somewhat limited in the present case solely based on the nature of the two charges at issue. The separate harms and victims analysis is simply not implicated in the current case but is something that courts must consider when dealing with the merger issue. Further, CCW and HWWUD do not implicate the *Miranda* analysis used when dealing with predicate offenses. Neither CCW nor HWWUD is a predicate offense for the other.

**{¶73}** In light of the separate conduct underlying both the CCW and HWWUD crimes, I agree that those sentences should not merge. I would merely limit the analysis to the undisputed fact that the conduct underlying the HWWUD was separate from that underlying the CCW charge. As a result, I concur with the majority's result and I would affirm the defendant's conviction.