[Cite as *State v. A.W.M.*, 2020-Ohio-4707.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 18AP-523 |
| | | (C.P.C. No. 17CR-2691) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| [A.W.M.], | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on September 30, 2020

**On brief**: *Ron O'Brien*, Prosecuting Attorney, and *Seth L. Gilbert*, for appellee. **Argued**: *Seth L. Gilbert*.

**On brief**: *The Law Office of Thomas F. Hayes, LLC*, and *Thomas F. Hayes* for appellant. **Argued**: *Thomas F. Hayes*.

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} This is an appeal by defendant-appellant, A.W.M., from a judgment of the Franklin County Court of Common Pleas following a jury trial in which he was found guilty of murder, felonious assault, and discharge of a firearm on or near prohibited premises.

{¶ 2} On February 18, 2016, appellant was charged in a juvenile complaint with one count of murder and two counts of felonious assault, arising out of the shooting death of K.W. on February 12, 2016. On February 19, 2016, plaintiff-appellee, State of Ohio, filed a motion requesting the juvenile court to transfer jurisdiction to the general division of the common pleas court. Following a bindover hearing, the juvenile court filed an entry sustaining the state's motion to relinquish jurisdiction.

{¶ 3} On May 17, 2017, the state filed an indictment charging appellant with one count of murder, in violation of R.C. 2903.02, two counts of felonious assault, in violation of R.C. 2903.11, and one count of discharge of a firearm on or near prohibited premises, in violation of R.C. 2923.162. The murder and felonious assault counts each carried firearm and criminal gang activity specifications, while the remaining count carried a firearm specification.

{¶ 4} The matter came for trial before a jury beginning May 21, 2018. The first witness for the state was Columbus Police Officer Jimmy T. Harrell. On February 12, 2016, at 6:07 p.m., Officer Harrell responded to a dispatch regarding a shooting at the Barnett Community Recreation Center ("recreation center") located near the intersection of Barnett Road and Livingston Avenue. Upon arriving, the officer observed a male shooting victim "lying in the parking lot area of Barnett Rec Center." (Tr. Vol. I at 26.) The victim appeared to be a male teenager; he had been shot in the chest and was "[m]otionless." (Tr. Vol. I at 27.) Two teenage females were at the scene with the victim.

{¶ 5} Medics arrived at the scene and the shooting victim, later identified as K.W., was transported to the hospital. The officer separated the two females; these witnesses mentioned there was a "known suspect" that was in a vehicle. (Tr. Vol. I at 29.) The name K.S. was provided to the officer as an individual who was in the car; the witnesses knew this individual as a student at Walnut Ridge High School.

{¶ 6} On cross-examination, Officer Harrell stated the female witnesses thought they could identify the shooter as an individual who attended Walnut Ridge High School. On redirect examination, Officer Harrell identified the names of the female witnesses, "J.A.C." and "J.E.C.," and noted they were sisters; J.E.C. is the younger sister of J.A.C. At least one of the sisters identified K.S. as the shooter.

{¶ 7} Columbus Police Detective Carlysle Coleman is part of the department's criminal intelligence unit, also known as "the gang unit." (Tr. Vol. I at 38.) Detective Coleman, who assisted in the investigation of the shooting death of K.W. testified that law enforcement personnel obtained video at the recreation center capturing images of the shooting incident. At trial, the video was played for the jury. Investigators also collected belongings from K.S.'s student locker at Walnut Ridge High School; the items contained

"gang graffiti," including a reference to "Blam Sq," which the detective testified "stands for squad, Blam Squad." (Tr. Vol. I at 49.)

{¶ 8} Outside the presence of the jury, the trial court conducted voir dire of K.S. Despite having entered into a defendant's agreement with the state, K.S. indicated his refusal to cooperate. At the conclusion of voir dire, the trial court found K.S. in contempt. The prosecutor then requested the trial court to permit the introduction of testimony previously given by K.S. during a juvenile bindover proceeding. Overruling an objection by defense counsel, the trial court ruled it would "permit the use of the prior testimony in the juvenile bindover matter" on the basis the witness was unavailable. (Tr. Vol. I at 86.)

{¶ 9} T.D., age 20, testified he has known appellant "since we were about 14." T.D. was "[v]ery close" to appellant's family. (Tr. Vol. II at 23.) Appellant has a nickname, "A.J." (Tr. Vol. II at 24.)

{¶ 10} On the afternoon of February 12, 2016, T.D. was at the home of his girlfriend. T.D. contacted appellant by Facebook Messenger, requesting appellant stop and pick him up. Appellant eventually arrived with C.W., A.B., and K.S.; they were driving a black, four-door Honda that C.W. "had stole[n]" within the last "week or two." (Tr. Vol. II at 32.) A.B. is a member of a Columbus gang, the Blam Squad, and his street name is "Remy." K.S. is a member of the Blam Squad, and his street name is "Y." (Tr. Vol. II at 31.) Appellant is also a member of the Blam Squad.

{¶ 11} The group drove to T.D.'s house to smoke marijuana. T.D. observed appellant with a "black .38 Smith and Wesson revolver." Appellant was carrying the weapon "[o]n his hip." (Tr. Vol. II at 33.) T.D. did not observe anyone else with a weapon that evening.

{¶ 12} At approximately 6:00 p.m., the group decided to drive to Orville, Ohio "to meet up with some girls." (Tr. Vol. II at 34.) T.D. was driving, while appellant sat in the front passenger seat; K.S. was in the back seat behind T.D., while A.B. was in the middle back seat, and C.W. sat in the rear seat behind appellant.

{¶ 13} On the way out of town, they drove past the recreation center. The group observed K.W. standing in the parking lot between the library and the recreation center; he was "with two younger females." (Tr. Vol. II at 35.) As they drove by, K.S. yelled out "Blam Squad, Fuck the Ops, RP Red." T.D. explained that his group, the Blam Squad, had

a dispute with a rival gang, the Elaine Gangsters.  T.D. stated "[w]e were beefing over a supposed shooting that they claimed that we had fired up."  (Tr. Vol. II at 36.)

{¶ 14} After driving past K.W. and the girls, T.D. turned into an alley and eventually drove back in the direction of K.W. and the two girls.  K.W. was "standing in between" the females.  As the vehicle drove by a second time, K.S. "was hanging out the windowsill of the car screaming, Blam Squad, Fuck the ops."  (Tr. Vol. II at 41.)  At that point, appellant "fired a single gunshot."  The shot was loud, and T.D. "felt the heat on [his] face and smelled the gunfire."  (Tr. Vol. II at 42.)  T.D. observed appellant fire the shot with the black revolver.

{¶ 15} After the shot was fired, T.D. "put [his] foot on the gas and drove faster and drove away."  (Tr. Vol. II at 42.)  Appellant "said, I think I hit him."  T.D. looked back and saw K.W. "fall behind the slope of the grass."  (Tr. Vol. II at 43.)  There was a discussion in the car about K.W. grabbing his chest.

{¶ 16} T.D. and the group "drove around for a while," but eventually "parked in the back of [his] house for a while, and then we went into [his] house."  (Tr. Vol. II at 43.)  The group discussed alibis they were going to use if questioned about the incident.  T.D. "was going to say that [he] was at [his] girlfriend's * * * house."  (Tr. Vol. II at 44.)  Appellant "said he was going to be at home."  (Tr. Vol. II at 44-45.)  K.S. "said he was going to be with one of his girlfriends."  (Tr. Vol. II at 45.)

{¶ 17} A day or so later, appellant, T.D., C.W., and K.S. were at appellant's house. K.S., who lived nearby, left appellant's residence; a short time later, SWAT members raided K.S.'s house and arrested K.S.  Upon seeing K.S.'s arrest, "we proceeded to hide the gun."  T.D. testified that appellant hid the black revolver "[i]n the cubby in the wall."  (Tr. Vol. II at 46.)

{¶ 18} Police officers arrested T.D. on February 19, 2016.  T.D. initially lied to police investigators to protect himself and his friends.  He also did not want to be labeled "a snitch."  (Tr. Vol. II at 47.)  At first, T.D. "lied about [C.W.]," failing to indicate he was in the car.  (Tr. Vol. II at 48.)  Near the end of the interview, he revealed that C.W. was in the vehicle.  T.D. also did not tell police investigators that appellant fired the shot.

{¶ 19} T.D. was subsequently charged with aggravated murder and murder, and counsel for T.D. arranged a meeting with the prosecutor's office.  On July 7, 2016, T.D.

met with prosecutors and agreed to a proffer statement in which he stated appellant was the shooter.  On August 25, 2016, T.D. entered into a defendant's agreement to cooperate, and a copy of the agreement was entered into evidence as state's Exhibit K.  Pursuant to the terms therein, T.D. agreed to testify truthfully regarding the shooting of K.W. in exchange for a guilty plea to one count of obstructing justice, a felony of the third degree, and one count of improperly handling a firearm, a felony of the fourth degree.

{¶ 20} On March 6, 2016, Michael Pfeiffer was employed as a shift supervisor with the Franklin County Juvenile Detention Center ("JDC").  JDC has a policy that forbids juvenile inmates passing written communications.  On the evening of March 6, 2016, Pfeiffer observed a letter in the hands of Joshua Pleasant, a juvenile detention officer. Pfeiffer intercepted the letter, obtained information from Pleasant, and then "went to the video cameras" where Pfeiffer observed appellant "writing a letter," place it in an envelope, and hand it to Pleasant.  (Tr. Vol. II at 86.)  Pfeiffer read the letter, which was addressed to co-defendant K.S.  Pfeiffer subsequently spoke with appellant, who initially denied writing the letter, telling Pfeiffer "it was a letter from his sister that his mom brought in for visitation."  (Tr. Vol. II at 92.)  A short time later, appellant told Pfeiffer "he had written the letter."  (Tr. Vol. II at 94.)

{¶ 21} At trial, the letter was admitted as state's Exhibit E-12.  In the letter, appellant stated in part: "I don't see no way that we both getting out this situation.  And to be 100, the only way I see one of us leaving is if you take it 100."  Appellant further stated, "if you do this for me * * * I got you.  I got some shit set up for some bands, and I got some other shit set up for a couple ms$. * * * On Crip, tell them I wasn't there at all."  (Tr. Vol. II at 95.)

{¶ 22} Dr. John A. Daniels, a Franklin County deputy coroner, performed the autopsy of K.W.  Coroners "removed a bullet from the tissues on the right side of [K.W.'s] back."  (Tr. Vol. II at 121.)  The bullet entered the victim "[j]ust below the left nipple."  (Tr. Vol. II at 122.)  The bullet traveled through a space between two ribs and "entered the pericardium sac, * * * the cavity that surrounds the heart," and then entered the "anterior, or front, wall of the left ventricle of the heart."  (Tr. Vol. II at 124.)  The bullet "exited the left ventricle" and "then continued to the right entering the medial, or * * * the surface of the lower lobe of the right lung."  (Tr. Vol. II at 124-25.)  The bullet "came to rest in the

subcutaneous tissues in the back."  Dr. Daniels noted the "course of the bullet was from front to back, from left to right and from above downward."  (Tr. Vol. II at 125.)  Dr. Daniels testified the cause of death "was ruled gunshot wound to the chest," and the "manner of death was ruled homicide."  (Tr. Vol. II at 128.)

{¶ 23}  At trial, the trial court informed the jury K.S. was unavailable to testify as a witness, and they were "not to draw any inference whatsoever from his absence as a witness."  (Tr. Vol. II at 135.)  The court permitted the state to read into the record K.S.'s prior testimony from the juvenile proceedings.

{¶ 24}  K.S., age 16 at the time of his testimony, testified he attended Walnut Ridge High School, and that A.B. also attended that school.  K.S. has known C.W. since the sixth grade.  K.S. knew both appellant and T.D. "[f]rom the neighborhood."  K.S. and appellant have been friends for two or three years.  K.S. and appellant were both members of the "Main Street" gang, which includes the Blam Squad.  (Tr. Vol. II at 138.)

{¶ 25}  K.S. was arrested and charged with murder as a result of the shooting death of K.W.  K.S. and his attorney subsequently entered into discussions with the prosecutor's office.  On May 3, 2016, K.S. signed a proffer letter and he later signed a defendant's agreement.  On June 1, 2016, K.S. entered a plea to a charge of inciting violence, a felony of the third degree.

{¶ 26}  K.S. gave the following testimony regarding the events of February 12, 2016.  On that date, K.S. received a ride from C.W. and appellant.  C.W. was driving a black Honda Accord.  Appellant's nickname is "A.J."  (Tr. Vol. II at 142.)  They later picked up T.D.  The group was smoking weed that evening.  K.S. observed appellant with a revolver.

{¶ 27}  T.D. subsequently drove the vehicle, with appellant sitting in the front passenger seat.  K.S. was in the back seat directly behind T.D., while A.B. was seated in the middle back seat, and C.W. was in the rear seat behind appellant.

{¶ 28}  That evening, they drove down Barnett Road and observed K.W., along with two females, standing in front of the local library.  K.S. was familiar with one of the females who attended his school.  K.W. was standing in the middle of the two females.  As they drove by, A.B. yelled out "Fuck Elaine," referring to a rival gang.  (Tr. Vol. II at 147.)  The vehicle turned off Barnett Road but eventually returned.  As they drove past the

library again, K.S. "got out of the window" and "yelled Main Street." At that point, K.W. "was throwing up gang signs." (Tr. Vol. II at 148.)

{¶ 29} As he was leaning out the window, K.S. heard a gunshot and he observed K.W. "grab his chest." (Tr. Vol. II at 150.) When K.S. returned to the interior of the vehicle, he observed a gun "[i]n [appellant's] lap." (Tr. Vol. II at 149.) It was the same weapon K.S. had observed earlier. A.B. and C.W. commented about K.W. grabbing his chest. A.B. said: "I think you hit him." (Tr. Vol. II at 151.) K.S. testified he thought A.B. made the statement to either appellant or T.D., but he did not observe T.D. with a weapon. K.S. also did not observe K.W. with a weapon, nor did he observe anyone other than appellant with a weapon that evening.

{¶ 30} Following the shooting, the group discussed what they were going to tell police. K.S. was going to say he was at appellant's house. Appellant was going to say "[h]e was at his house with [K.S.]." A.B. was going to say he was "[o]ut of town," while T.D. was going to say he was at "[h]is baby mom's house." (Tr. Vol. II at 153.) K.S. acknowledged they were making up alibis at that point. K.S. was arrested a day or two later, and he lied to police at that time.

{¶ 31} Columbus Police Detective William Best is assigned to the department's criminal intelligence unit, also "called the gang unit." (Tr. Vol. III at 6.) At trial, the court designated Detective Best as an expert in the field of criminal street gangs. Detective Best testified he was familiar with the "East Main Money Gang." (Tr. Vol. III at 16.) He stated the Blam Squad is a subset of the East Main Money Gang; there are approximately 20 documented members of those two entities. The Blam Squad operates in the area "from East Main, Barnett, East Main, James." (Tr. Vol. III at 30.) Another group, the "Elaine Gangsters," operates "from South Hamilton and Livingston to about the Barnett Rec, which is at Barnett and East Livingston." (Tr. Vol. III at 30-31.) In February 2016, there was an "ongoing" rivalry between the Elaine Gangsters and the Blam Squad. (Tr. Vol. III at 31.)

{¶ 32} Detective Best assisted in the investigation of the shooting death of K.W., including a review of background information to determine if certain individuals, including appellant, met the criteria of a gang member. As part of the investigation, Detective Best determined appellant was a member of the Blam Squad; he further

determined K.S. and A.B. were also members of the Blam Squad; C.W. was not a member of the gang.

{¶ 33} Outside the presence of the jury, the trial court permitted voir dire of Columbus Police Detective Robert A. Cutshall, the lead detective in the investigation of the shooting death of K.W. Shortly after the shooting, patrol officers spoke at the crime scene with two female juveniles, J.E.C., age 14, and J.A.C., age 16. Later that evening, police investigators interviewed both J.E.C. and J.A.C., who are sisters, at Columbus Police Headquarters. The detective described J.E.C. as "extremely" calm for her age, and that she was able to answer questions in "detail." (Tr. Vol. III at 67.) During voir dire, portions of the recorded interviews at police headquarters were played.

{¶ 34} Following voir dire of the detective, the trial court ruled that statements by J.E.C. at police headquarters did not qualify for admission as excited utterances under Evid.R. 803(2). The trial court determined "[s]he was not still under the extreme stress or excitement of the event at the time the statements were made at this point," and "she was very calm leading up to this." (Tr. Vol. III at 69.) The trial court thus determined the testimony at issue was inadmissible, and the court also granted the state's request for a motion in limine to preclude questions regarding what either J.E.C. or J.A.C. told Detective Cutshall during those interviews at police headquarters.

{¶ 35} Following voir dire, Detective Cutshall testified before the jury. On the date of the shooting incident, Detective Cutshall arrived at the scene at 7:17 p.m. No physical evidence, except for a cigarette lighter, was found at the scene. The detective noted that in cases in which a revolver is used in a shooting, a shell casing is not ejected upon firing. At the scene, police investigators initially received the first name of a suspect, [A.B.]. Later, the name K.S. arose as a suspect. Detective Cutshall testified that appellant subsequently became the main suspect in the shooting death of K.W. Police investigators never recovered a firearm as part of the investigation.

{¶ 36} Detectives subsequently obtained video from the recreation center; the video depicts the suspect vehicle traveling north on Barnett Road past the recreation center. As part of his investigation, Detective Cutshall attempted to speak to J.E.C. and J.A.C. who were with K.W. at the time of the shooting. The detective testified that the mother of the teenagers "denied me access to the daughters." (Tr. Vol. III at 82.)

{¶ 37} As part of the investigation, Detective Cutshall interviewed both T.D. and K.S., and the detective subsequently developed appellant as a suspect. Detective Cutshall eventually determined that the individuals in the vehicle during the incident were appellant, T.D., K.S., A.B., and C.W. The detective testified he obtained Facebook records of these individuals, which included photographs of persons making gang signals. Appellant's username is "Jizzle Bod." (Tr. Vol. III at 87.) The detective testified he recovered conversations between appellant and T.D. (whose username is "Ty Bod"), as well as conversations between appellant and C.W. on the date of the incident. (Tr. Vol. III at 88.)

{¶ 38} Police officers arrested appellant on February 18, 2016. Detective Cutshall participated in the interview of appellant at police headquarters, and video of that interview was admitted at trial as state's Exhibit O. During the interview, appellant told the detective that "nobody calls him AJ for real." Appellant stated he was "home all day" on the date of the events. (Tr. Vol. III at 96.)

{¶ 39} The detective testified that appellant's Facebook records indicate he left his house that day. Specifically, he told C.W. to "[s]lide by and pick him up" in the back alley of his residence. (Tr. Vol. III at 97.) Appellant stated he "doesn't hang with [A.B.] for real." (Tr. Vol. III at 99.)

{¶ 40} On cross-examination, Detective Cutshall stated that Officer Harrell was the first officer to speak at the scene with J.E.C. and J.A.C., who were with K.W. at the time of the shooting. Detective Cutshall stated the first name of a suspect provided during the investigation was A.B. Later, the name K.S. was provided. K.S. was arrested one day after the incident, and T.D., C.W., and A.B. were subsequently arrested and charged with murder. Charges were later dismissed with respect to C.W. and A.B. Police officers searched appellant's residence as part of the investigation; no weapon was found at that residence.

{¶ 41} At the close of the state's case-in-chief, counsel for appellant made a Crim.R. 29 motion for judgment of acquittal, as well as a motion for mistrial based on rulings of the trial court. The trial court denied both motions. Counsel for appellant also made a proffer on the record with respect to exhibits appellant sought to admit regarding interviews of J.A.C. and J.E.C.

{¶ 42} Following deliberations, the jury returned verdicts finding appellant guilty of all four counts, including the specifications.  By judgment entry filed June 11, 2018, the trial court imposed an aggregate sentence of 29 years to life.

{¶ 43} On appeal, appellant sets forth the following 11 assignments of error for this court's review:

> 1. The judge instructed the jury that the jury could find [appellant] guilty even if [appellant] is not the shooter.
>
> 2. The prosecutor in closing argument asked the jury to infer guilt from [appellant's] silence.
>
> 3. The judge excluded exculpatory evidence tending to prove that [K.S.] is the shooter.
>
> 4. The judge allowed evidence that [T.D.] was subjected to intimidation at the time of trial.
>
> 5. The judge allowed Exhibits J-1 to J-12, unauthenticated statements and hearsay statements acquired from Facebook, Inc.
>
> 6. The judge allowed Detective Cutshall to testify regarding the contents of Facebook webpages, in violation of Evid.R. 1002.
>
> 7. [Appellant] was denied a fair trial by ineffective assistance of counsel.
>
> 8. The cumulative effect of the foregoing errors violated [appellant's] federal and state constitutional due process guarantees of a fair trial.
>
> 9. The convictions for felonious assault upon the bystander sisters (Counts 2 and 3) are not supported by sufficient evidence and are contrary to the manifest weight of the evidence.
>
> 10. The judge failed to merge Counts 2 and 3 (felonious assault of the bystander sisters) with Count 1 (murder of [K.W.]).
>
> 11. The judge failed to merge Count 4 (discharging a firearm near prohibited premises) with Count 1, 2, or 3.

{¶ 44} Under the first assignment of error, appellant asserts the trial court erred in granting the state's request to instruct the jury on complicity. According to appellant, the only reasonable interpretation of the state's evidence is that the shooting was the surprise, unilateral act of one individual, and that there are only two possibilities: (1) either appellant was the shooter, in which case he was not a complicitor, or (2) another individual was the shooter, in which case a complicity instruction was improper.

{¶ 45} Appellant notes the state requested a jury instruction on complicity over the defense's objection, and the trial court granted the state's request. The trial court instructed the jury in part as follows:

> A defendant may be convicted of an offense such as murder either as a principal offender or as a complicitor.
>
> Complicity occurs when a person aids or abets another in the commission of an offense. * * * An aider or abettor is one who with the culpable mental state aids, assists, encourages, corroborates with, advises, or incites another to commit a crime and participates in the commission of the offense by some act, word, or gesture. Aid means to help, assist, or strengthen. Abet means to encourage, counsel, incite, or assist.
>
> * * *
>
> Criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed. In addition, mere presence can be enough if it is intended to and does aid the primary offender.

(Tr. Vol. IV at 74-75.)

{¶ 46} In response, the state, citing testimony by T.D. and K.S. that appellant was the only individual in the vehicle with a weapon, maintains the trier of fact could reasonably infer that appellant, even if not the shooter, supplied the weapon to the shooter. The state argues there was additional evidence to support appellant's guilt as a complicitor to warrant the jury instruction, including evidence as to his conduct following the shooting, and the fact the shooting was gang related.

{¶ 47} R.C. 2923.03(A)(2) provides in part: "No person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in

committing the offense."  In order to support a conviction for complicity by aiding and abetting under R.C. 2923.03(A)(2), "the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal."  *State v. Johnson*, 93 Ohio St.3d 240, 245-46 (2001).  Further, "[s]uch intent may be inferred from the circumstances surrounding the crime."  *Id.* at 246.  In this respect, " 'participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.' "  *Id.* at 245, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34 (4th Dist.1971).

{¶ 48} Pursuant to R.C. 2923.03(F), "[a] charge of complicity may be stated in terms of this section, or in terms of the principal offense."  Accordingly, "a defendant charged with an offense may be convicted of that offense upon proof that he was complicit in its commission, even though the indictment is 'stated * * * in terms of the principal offense' and does not mention complicity," as the language of R.C. 2923.03(F) "adequately notifies defendants that the jury may be instructed on complicity, even when the charge is drawn in terms of the principal offense."  *State v. Herring*, 94 Ohio St.3d 246, 251 (2002), citing *State v. Keenan*, 81 Ohio St.3d 133, 151 (1998), citing *Hill v. Perini*, 788 F.2d 406, 407-08 (6th Cir.1986).

{¶ 49} In reviewing a trial court's jury instructions, "the proper standard of review for an appellate court is whether the trial court's refusal to give a requested instruction or giving an instruction constituted an abuse of discretion under the facts and circumstances of the case."  *State v. Williams*, 8th Dist. No. 90845, 2009-Ohio-2026, ¶ 50, citing *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989). Further, "an instruction on complicity is justified when the evidence could be interpreted to support alternative findings as to the exact role of the defendant."  *State v. Tuff,* 11th Dist. No. 2010-L-082, 2011-Ohio-6846, ¶ 53, citing *State v. Sweeney*, 11th Dist. No. 2006-L-252, 2007-Ohio-5223, ¶ 62. *See also State v. Chapman*, 8th Dist. No. 79607 (Feb. 7, 2002) ("In order to support a charge of complicity in jury instructions, there must be some evidence that the defendant solicited or procured another to commit the offense of those charges in the indictment, or aided or abetted another."); *State v. Cornwell,* 86 Ohio St.3d 560, 567 (1999) (although state's theory was that appellant was the sole gunman, trial court did not err in instructing on complicity

where some testimony by accomplices could be construed as conflicting and the complicity instruction "gave the jury the opportunity to convict [the defendant] as an accomplice, if, for instance, the jury had a reasonable doubt as to whether he was the actual shooter").

{¶ 50} In the present case, the record supports the trial court's decision to instruct on complicity. As noted by the state, both T.D. and K.S. testified appellant was the only individual observed in the vehicle with a weapon on the date of the shooting. Even accepting that some other occupant of the vehicle was the shooter, we agree with the state that the jury could reasonably infer appellant provided the weapon to the individual who fired the fatal shot. *See State v. Alexander*, 9th Dist. No. 22295, 2005-Ohio-2393, ¶ 19-21 (jury could find appellant guilty of complicity to commit murder based on evidence he supplied murder weapon to co-defendant).[1]

{¶ 51} The record additionally supports the state's argument that evidence as to appellant's conduct following the shooting indicates he was more than just a non-complicit bystander. Under Ohio law, "a defendant's conduct before and after a crime is relevant to whether he was an aider or abettor under a complicity theory of criminal culpability." *State v. Brown*, 11th Dist. No. 2014-L-037, 2016-Ohio-1358, ¶ 149.

{¶ 52} At trial, the state presented evidence that appellant fled the scene with the other occupants of the vehicle immediately after the shooting, subsequently developed an alibi, and later hid the murder weapon after K.S.'s arrest. At the time of his own arrest, appellant provided a false alibi to law enforcement, i.e., stating he was at home on the date of the shooting. The state also presented evidence that appellant attempted to influence K.S. while in the JDC, sending a note to K.S. stating they were both not "getting out [of] this situation," and offering K.S. money to say appellant "wasn't there at all." (Tr. Vol. II at 95.) In light of the record presented, there was sufficient evidence to show that appellant, even if not the principal offender, aided and abetted in the shooting of K.W. Accordingly, the trial court did not abuse its discretion in providing a complicity instruction to the jury.

---

[1] At least one court has found relevant to the issue of complicity evidence that the shooting victim was a member of a rival gang. *See People v. Reed*, Cal.App. 2d Dist. No. B155966 (May 29, 2003) (supplying firearms to fellow gang members constitutes aiding, promoting and encouraging the commission of shootings that follow).

{¶ 53} Appellant's first assignment of error is not well-taken and is overruled.

{¶ 54} Under the second assignment of error, appellant asserts the prosecutor engaged in misconduct during closing argument by making an improper comment on appellant's right to remain silent. Appellant notes the state, during its case-in-chief, introduced a video recording of the police interrogation of appellant. Appellant argues, based on the video recording, the prosecutor asked the jury to infer guilt from his silence upon being told by a detective that he was being charged with the murder of K.W.

{¶ 55} Appellant points to the following comments by the prosecutor during closing arguments to the jury:

> And think about this. Think about your friends, anybody else and whether it be a gang member or not, look at that, that reaction. At 11:54, detective says, you're charged with murder. What was his reaction? Shrugs, it goes one minute and six seconds takes him to say, I didn't do it. Think about that. You're charged with murder. Everybody says you did it. I'm done talking. And he slouches over. Common sense, folks. Is that a normal reaction for getting -- somebody telling you you're charged with murder? No, it's not.

(Tr. Vol. IV at 65.)

{¶ 56} Appellant specifically challenges the prosecutor's statement that appellant, upon being told he was being charged with murder, simply "[s]hrugs" and then responds, after "one minute and six seconds," that he "didn't do it." (Tr. Vol. IV at 65.) Appellant acknowledges defense counsel did not object to the above comments, but argues the statements constitute plain error as an improper comment on his right to remain silent and his failure to testify. We disagree.

{¶ 57} As acknowledged by appellant, the failure to object to closing arguments at trial results in the waiver of all but plain error. *State v. Wiley*, 8th Dist. No. 99576, 2014-Ohio-27, ¶ 59. Under Ohio law, "[r]eversal for prosecutorial misconduct is warranted under the plain error standard only if it is clear that defendant would not have been convicted in the absence of the improper conduct." *Id.,* citing *State v. McGlothan*, 8th Dist. No. 97212, 2012-Ohio-4049, ¶ 32; *Cleveland v. Coleman*, 8th Dist. No. 97128, 2012-Ohio-3942, ¶ 41, citing *State v. Saleh*, 10th Dist. No. 07AP-431, 2009-Ohio-1542, ¶ 68.

{¶ 58} In *Doyle v. Ohio*, 426 U.S. 610 (1976), "the United States Supreme Court held that testimony of a defendant's post-arrest silence, which also occurs subsequent to

the administration of *Miranda* warnings, violates the defendant's privilege against self-incrimination incorporated into the Due Process Clause of the Fourteenth Amendment." *State v. Ospina*, 81 Ohio App.3d 644, 649 (10th Dist.1992), citing *Doyle* at 618. Such a violation "is rooted in the concept that it would be fundamentally unfair for the state to induce a defendant's silence through a promise that it later breaches." *State v. Robinson,* 1st Dist. No. C-170147, 2019-Ohio-387, ¶ 30, citing *Doyle* at 618.

{¶ 59} However, "[w]here the accused initially waives his right to remain silent and agrees to questioning, * * * no such inducement has occurred." *United States v. Harris*, 956 F.2d 177, 181 (8th Cir.1992). *See also Anderson v. Charles*, 447 U.S. 404, 408 (1980) ("a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent").

{¶ 60} In the present case, with respect to the portion of the video of the interview played at trial, appellant does not challenge the fact he was informed of his right to remain silent but waived it.[2] As argued by the state, appellant was not silent but, after waiving his rights, made statements that included his denial as to involvement in the shooting. Further, the fact appellant waited approximately one minute to respond to the detective's inquiry does not implicate *Doyle. See March v. Bock*, E.D.Mich. No. 00-10495 (June 12, 2003) ("prosecution was entitled to note the petitioner's period of silence [of about a half an hour] after giving his first statement, because after the period of silence, the petitioner continued to speak to the police").

{¶ 61} Appellant also challenges the prosecutor's reference to the fact appellant merely shrugged when confronted with the fact he was going to be charged with murder. The Supreme Court of Ohio, however, has held that a prosecutor "may comment" on matters such as a defendant's demeanor. *State v. Ladson*, 8th Dist. No. 105914, 2018-Ohio-1299, ¶ 38, citing *State v. Green*, 90 Ohio St.3d 352, 373 (2000) ("Because we are bound to follow the Ohio Supreme Court's precedent, we find that the prosecutor could comment on Ladson's demeanor and that his remarks were not improper."); *State v. Hill*, 75 Ohio St.3d 195, 203 (1996). *See also State v. Doak,* 11th Dist. No. 2018-P-0022, 2020-

---

[2] As noted by the state, during the interview at issue, appellant later requested an attorney but the state did not introduce portions of the video beyond that point. During a pre-trial hearing, the trial court cited the state's acknowledgement "that statements that were made after the Defendant requested counsel at around 54 minutes and 36 seconds into the interview are inadmissible." (Jan. 4, 2018 Tr. at 3.)

Ohio-66, ¶ 58 (no error with respect to prosecutor's comment regarding defendant's quiet reaction after being told of accusation as "prosecutor's points relate more to appellant's demeanor and the arguable peculiarity of appellant's reticence" and were "not obviously directed at appellant's pre-arrest silence").

{¶ 62} Accordingly, because we conclude the prosecutor did not impermissibly comment on appellant's Fifth Amendment right to remain silent during closing arguments, appellant has failed to show error, plain or otherwise.

{¶ 63} Appellant's second assignment of error is not well-taken and is overruled.

{¶ 64} Under the third assignment of error, appellant asserts the trial court erred in excluding exculpatory evidence tending to prove K.S. was the shooter. Appellant raises several separate arguments under this assigned error.

{¶ 65} Appellant first argues the trial court erred in excluding: (1) the video-recorded statements of the younger sister (J.E.C.) made during an interview at police headquarters (proffered as defendant's Exhibit No. 4), identifying K.S. as the shooter and stating the shooter wore a red jacket, and (2) the detective's written summary of that interview (proffered as defendant's Exhibit No. 7). Appellant notes the two sisters did not testify at trial, and the trial court conducted voir dire of Detective Cutshall, outside the presence of the jury, in order to determine the admissibility of their statements made on the date of the shooting. The trial court excluded, as hearsay, the sisters' statements with the exception of those they provided to the first responding police officer at the shooting scene. The basis of the trial court's ruling was that the statements, made hours after the incident at police headquarters, were not admissible under the excited utterances exception to the hearsay rule, Evid.R. 803(2).

{¶ 66} Appellant argues the video-recorded statements of J.E.C. and the detective's written summary should have been admitted for two reasons: (1) the prosecutor's direct examination of Detective Cutshall opened the door to hearsay about what police learned during their investigation when the court allowed the prosecutor, on direct examination, to elicit from Detective Cutshall hearsay statements under the guise of what police heard during the investigation, and (2) the due process clause embodies a right to present a defense which controls over a state law hearsay rule. Appellant challenges, on the same grounds, the trial court's rulings with respect to the defense's attempt to introduce a

written statement by J.E.C., and to question the detective as to what J.E.C. told him during the interview.

{¶ 67} We initially address appellant's contention that the prosecutor, during direct examination of Detective Cutshall, "opened the door" to hearsay evidence regarding what police learned during the investigation. According to appellant, the trial court should have allowed the defense to introduce the statements of J.E.C. because the state was permitted to introduce three instances of hearsay statements. Specifically, appellant argues the state introduced inadmissible evidence based on the detective's testimony that: (1) the name of an initial suspect was A.B., (2) investigators developed appellant as a suspect after speaking with T.D. and K.S., and (3) appellant's mother was unable to verify his whereabouts during the time of the incident.

{¶ 68} As noted, following voir dire of the detective, the trial court precluded the admission of statements by the sisters made during their interview at police headquarters on the grounds the statements constituted hearsay and were not the product of an excited utterance. As also noted, the trial court permitted the admission of statements made by the sisters to the responding officer at the scene (i.e., statements made by the sisters to Columbus Police Officer Harrell).

{¶ 69} On appeal, appellant does not challenge the trial court's determination that the statements made by the sisters to detectives during the interview at police headquarters constituted hearsay, nor does appellant challenge the trial court's ruling that the statements did not qualify for admission under the hearsay exception for excited utterances.[3] Rather, as noted, appellant seeks reversal of the trial court's ruling on the statements at issue based on his reliance of the concept of "opening the door."

{¶ 70} Under Ohio law, "[a] trial court's admission of evidence is reviewed for abuse of discretion." *State v. Dunivant*, 5th Dist. No. 2003CA00175, 2005-Ohio-1497, ¶ 11, citing *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, ¶ 79. In undertaking such review, "an appellate court may not merely substitute its judgment for that of the trial court." *Id.*

---

[3] Under Evid.R. 803(2), "otherwise inadmissible hearsay is admissible if it is a 'statement relating to a startling event or condition made while the declarant was under the stress or excitement caused by the event or condition.' " *State v. Clark*, 8th Dist. No. 103324, 2016-Ohio-4561, ¶ 34.

{¶ 71} In general, "[t]he evidentiary concept of 'opening the door' embodies the concepts of waiver and fairness," whereby "[i]f one party offers evidence that is otherwise inadmissible as being irrelevant under the rules of evidence, the courts will consider that a waiver of the rules and in fairness allow the opposing party to present testimony or evidence on the same point." *State v. Dunbar*, 8th Dist. No. 89896, 2008-Ohio-2033, ¶ 31. *See also State v. DeLeon*, 2d Dist. No. 18114 (May 25, 2001), citing *United States v. Segines,* 17 F.3d 847, 856 (6th Cir.1994) ("Under the 'opening the door' doctrine, where a party has elicited or introduced prejudicial or inadmissible testimony, his opponent, in the trial court's discretion, may introduce evidence on the same issue in order to rebut any false impression that may have resulted from the earlier admission.").

{¶ 72} Several Ohio courts have addressed the issue of whether a party can "open the door" to otherwise inadmissible hearsay evidence. In *State v. Griffin*, 142 Ohio App.3d 65 (1st Dist.2001), a case cited by appellant, the First District Court of Appeals addressed an argument by the state that defense counsel had opened the door to hearsay statements by the defendant. The court in *Griffin* initially "noted that the 'open door' theory is theoretically intended to be curative," and that "[t]he justification for a party's use of improper rebuttal evidence is the necessity to respond to the opponent's first use of such evidence." *Id.* at 78. Thus, the court noted, "the theory is a means of counterattack." *Id.* Under the facts in *Griffin*, the court rejected the state's argument that the defense opened the door to inadmissible hearsay, noting that, rather than seeking to invoke the theory "as a response to improper hearsay, the state is urging the 'open door' theory as a means to justify the state's introduction of improper, highly prejudicial hearsay evidence for the first time." *Id.* at 78-79.

{¶ 73} In another decision cited by appellant, *State v. Rivera*, 9th Dist. No. 93CA005592 (Sept. 28, 1994), the defendant argued on appeal that the trial court erred in permitting the state to introduce inadmissible hearsay evidence at trial, including testimony by a detective that an alleged employee of the defendant was a drug distributor who told the detective he had just returned from a trip to pick up cocaine for the defendant. In response, the state "asserted that defendant 'opened the door' during his cross-examination of [the detective] by allegedly inquiring about a statement [the employee] apparently made at the time he was arrested." *Id.*

{¶ 74} The court in *Rivera* rejected the state's argument, holding in part: "To accept the State's argument that defendant 'opened the door' to [the detective's] testimony" that the employee stated he worked as a drug dealer for the defendant "would turn 'opening the door' into a license for unbridled introduction of inadmissible evidence far beyond anything that could be viewed as necessary to counteract unfair prejudice caused by the original inadmissible evidence." *Id.* The reviewing court cautioned that "[s]uch a procedure would exceed any view of what is appropriate pursuant to the 'opening the door' concept." *Id.*

{¶ 75} As noted above, appellant argues he was prejudiced by the fact the state was permitted to introduce statements by the detective that: (1) A.B. was initially a suspect, (2) appellant became a suspect after the detective spoke to K.S. and T.D., and (3) appellant's mother was unable to verify her son's whereabouts between the time of 6:00 and 7:00 p.m. on the date of the incident.

{¶ 76} In response, the state argues appellant cannot show plain error, and that the "opening the door" doctrine does not permit the introduction of inadmissible hearsay simply because the other party admitted out-of-court statements. The state maintains appellant does not claim admitting the statements of J.E.C. was necessary to rebut the state's first use of these statements; rather, the state argues, appellant asserts the prosecution opened the door to J.E.C.'s statements simply by admitting other out-of-court statements.

{¶ 77} With respect to the detective's testimony that A.B. was initially a suspect, we note counsel raised no objection, presumably because such testimony was not inculpatory of appellant. Ohio courts have held that "[a] prerequisite of any view regarding 'opening the door' is that the initial irrelevant evidence was somehow prejudicial to the party attempting to present rebuttal evidence." *State v. Staats*, 9th Dist. No. 15706 (Apr. 13, 1994). Here, evidence that A.B. was a suspect was not prejudicial to appellant, and we therefore find the opening the door doctrine inapplicable.

{¶ 78} Defense counsel also did not object to the detective's statement that appellant became a suspect after speaking with K.S. and T.D. Under Ohio law, statements offered to explain an officer's conduct in investigating a crime are "not hearsay." *State v. Blevins*, 36 Ohio App.3d 147, 149 (10th Dist.1987). *See also State v. Ricks,* 136 Ohio St.3d

356, 2013-Ohio-3721, ¶ 20 (out-of-court statements admitted to explain police conduct are not hearsay).

{¶ 79} In order to be "admissible under the doctrine of curative admissibility, the evidence that allegedly opened the door must in fact have been inadmissible." *United States v. Rea*, 958 F.2d 1206, 1225 (2d Cir.1992). Stated otherwise, "[p]roperly admitted evidence does not open the door to inadmissible evidence." *Id.* Here, because the testimony of Detective Cutshall regarding the development of appellant as a suspect was arguably admissible for a non-hearsay purpose, appellant cannot rely on such testimony as a basis to open the door to inadmissible hearsay. Further, as noted by the state, the subject statement did not add anything to the case beyond what the jury already knew based on the testimony of T.D. and K.S.

{¶ 80} Appellant also contends the state opened the door to defense's proffered evidence based on the prosecutor's questioning of the detective about his discussion with appellant's mother, who stated she could not account for appellant's whereabouts during a certain period of time on the date of the shooting. We note defense counsel did raise an objection to this inquiry. During a sidebar, the prosecutor indicated the state "was trying not to go and serve" the mother with a subpoena but could do so. Alternatively, the prosecutor sought to question the detective as to whether the mother was able to verify his whereabouts and "leave it at just that." The trial court instructed the prosecutor to "[l]eave it at just that." (Tr. Vol. III at 101.)

{¶ 81} Appellant's claim that the detective's testimony regarding his discussion with appellant's mother opened the door and made permissible admission of an unrelated out-of-court statement (i.e., J.E.C.'s statement regarding her identification of K.S.) is not persuasive. As one federal court has observed: " 'Opening the door is one thing. What comes through the door is another.' " *United States v. Brown*, 921 F.2d 1304, 1307 (D.C. Cir.1990), quoting *United States v. Winston,* 447 F.2d 1236, 1240 (D.C. Cir.1971). Thus, "the range of otherwise-inadmissible evidence that may be squeezed through an 'open door' is limited." *Id.* at 1308. In this respect, Ohio courts have limited application of the "open the door" concept to the introduction of evidence on "the same issue in order to rebut any false impression that may have resulted from the earlier admission." *DeLeon. See also State v. Thompson,* 8th Dist. No. 40570 (Apr. 17, 1980) (hearsay testimony of

officer "did not open the door" to admit other hearsay that "went beyond merely negating or explaining the original hearsay testimony"). Here, appellant cannot show the trial court erred in failing to find the state opened the door to the hearsay statements of J.E.C. regarding K.S. in order to explain, negate, or correct a false impression left by the state's questioning of the detective on the subject of his discussion with appellant's mother.

{¶ 82} In the alternative, appellant argues the statements of J.E.C. should have been admissible on constitutional grounds. Specifically, appellant contends that application of the state law hearsay rule in this case violated his due process rights. In support, appellant cites *Chambers v. Mississippi*, 410 U.S. 284 (1973), *Green v. Georgia,* 442 U.S. 95 (1979), and *Holmes v. South Carolina,* 547 U.S. 319 (2006).

{¶ 83} In *Chambers,* the United States Supreme Court determined the exclusion of an oral confession by a third party denied the accused the right to a fair trial, holding in part that "the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Chambers* at 302. Under the facts of that case, the trial court "applied the [state's] 'voucher rule' and refused to allow the defendant to treat the witness as adverse and cross-examine him." *United States v. Camacho*, 163 F.Supp.2d 287, 316 (S.D.N.Y. 2008), fn. 17. Furthermore, "the state court refused to permit evidence of the out-of-court confessions to be admitted" at trial because Mississippi "did not have an exception to the hearsay rule for statements against penal interest." *Id.* Emphasizing the "unusual circumstances of the case," the United States Supreme Court in *Chambers* "held that the state court's application of the voucher rule and the hearsay rule, in combination, violated the defendant's due process right to present his defense." *Id.*, citing *Chambers* at 298. The Supreme Court also found "the highly reliable nature of the out-of-court statements and the presence at trial of the declarant distinguished the case" from an earlier state court decision. *Id. See also State v. Yarborough,* 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 68 (noting "the *Chambers* declarant was available to be cross-examined").

{¶ 84} Similarly, in *Green*, the United States Supreme Court held a defendant was denied a fair trial during the sentencing/punishment phase of a death penalty case based on Georgia's hearsay rule for declarations made against penal interest where a trial court excluded the confession of a co-conspirator made to a close friend. The United States Supreme Court found the evidence to be sufficiently reliable based on the fact "[t]he

statement was against interest" and, "[p]erhaps most important, the State considered the testimony sufficiently reliable to use it against [the co-conspirator], and to base a sentence of death upon it."  *Id.* at 97.   Citing "these unique circumstances," the United States Supreme Court relied on *Chambers* to again hold that state hearsay rules may not be applied mechanistically.  *Id.*

{¶ 85}  In *State v. Swann*, 119 Ohio St.3d 552, 2008-Ohio-4837, the Supreme Court of Ohio discussed the issue of the right to a meaningful opportunity to present a complete defense in the context of United States Supreme Court precedent, including *Chambers*, *Holmes*, and *United States v. Scheffer,* 523 U.S. 303, 308 (1998)*.*  Specifically, the court noted *Chambers* "recognized that '[t]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations.' "   *Swann* at ¶ 12, quoting *Chambers* at 294.   The Supreme Court of Ohio observed, however, "that this constitutional right is not absolute and does not require the admission of *all* evidence favorable to the defendant."  (Emphasis sic.)   *Id.* at ¶ 13, citing *Scheffer* at 308.

{¶ 86}  The court in *Swann*, at ¶ 14-15, further held:

> As the court acknowledged in *Chambers*, "In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." 410 U.S. at 302, 93 S.Ct. 1038 * * *. The court has further emphasized that "[s]tate and Federal Governments unquestionably have a legitimate interest in ensuring that reliable evidence is presented to the trier of fact in a criminal trial. Indeed, the exclusion of unreliable evidence is a principal objective of many evidentiary rules." *Scheffer*, 523 U.S. at 309, 118 S.Ct. 1261, * * * citing Fed.R.Evid. 702, 802, and 901 * * *.
>
> Accordingly, in *Scheffer* the court clarified that "*Chambers* therefore does not stand for the proposition that the defendant is denied a fair opportunity to defend himself whenever a state or federal rule excludes favorable evidence." *Id.* at 316, 118 S.Ct. 1261 * * *. Rather, it emphasized, "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials.  Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or

'disproportionate to the purposes they are designed to serve.' "
*Id.* at 308, 118 S.Ct. 1261 * * *.

{¶ 87} The Supreme Court in *Swann* further observed that the decision in *Holmes* "did not hold that every rule that excludes evidence of third-party guilt is necessarily unconstitutional or that a criminal defendant has a right to present all evidence of third-party guilt." *Id.* at ¶ 19. Rather, the court noted: "in *Holmes*, the court adhered to its earlier decisions in *Chambers* * * * and *Scheffer*, and reiterated that the right to present a complete defense 'is abridged by evidence rules that "infring[e] upon a weighty interest of the accused" and are " 'arbitrary' or 'disproportionate to the purposes they are designed to serve.' " ' " *Id.,* quoting *Holmes* at 324-25, quoting *Scheffer* at 308, quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987).

{¶ 88} As previously noted, appellant does not challenge the trial court's determination that the statements of J.E.C. were not admissible under the excited utterance hearsay exception. Here, the trial court, after conducting voir dire of the detective, determined the statements of J.E.C., made at police headquarters approximately two to four hours after the incident, were made at a time when she was calm and had an opportunity to reflect on the events (i.e., lacking indicia of reliability required for admission under excited utterance exception). Appellant cannot show the trial court's application of the excited utterance rule was arbitrary. In this respect, "courts have held that the exclusion of alleged excited utterances on grounds that the prerequisite for admission of such statements has not been satisfied is not a violation of the due process right to present a defense because such exclusion is neither arbitrary or unfair." *Dillon v. Warden, Ross Corr. Inst.*, S.D.Ohio No. 2:10-cv-638 (Nov. 10, 2011), citing *Berry v. Harrington*, C.D.Cal. No. CV 09-4269-VAP (OP) (Feb. 22, 2010), citing *Scheffer* at 308.

{¶ 89} Nor does the record indicate the trial court applied the rule "mechanistically to defeat the ends of justice." *Chambers* at 302. As previously noted, while the trial court precluded the interview statements made hours after the event, the court permitted the admission of statements made by J.A.C. and J.E.C. at the scene to the first responding police officer. In addition to the hearsay question, the trial court could have reasonably concluded J.E.C.'s statement to the detective regarding K.S. was unreliable based on the

prosecutor's argument that her statement was contradictory to the statement of J.A.C., that K.S. did not have a weapon.[4]  Further, unlike in *Chambers,* J.E.C.'s statement did not involve a confession, and she was unavailable to testify and not subject to cross-examination.   This court has previously noted the holding in *Chambers* "actually recognizes the unreliability of out-of-court statements where, as here, the declarant does not testify and is not subject to cross-examination."  *State v. Dickerson,* 10th Dist. No. 11AP-789, 2012-Ohio-3268, ¶ 25.  *See also Yarborough* at ¶ 67-68 (distinguishing facts of *Chambers* where declarant's statements did not amount to a confession and where declarant was not available to be cross-examined).   Upon review, we do not find persuasive appellant's contention that the trial court's application of the hearsay rule resulted in a constitutional violation under *Chambers* and its progeny.

{¶ 90} Appellant also asserts the trial court erred in excluding Exhibit 7, the detective's written summary of his interview of J.E.C., on grounds such statements are non-hearsay admissions by a party-opponent under Evid.R. 801(D)(2).  Alternatively, appellant argues that, even if the statements constitute hearsay, they are admissible under Evid.R. 803(8) as an exception for public records and reports.

{¶ 91} Appellant's claim that the detective's written summary of J.E.C.'s statements are non-hearsay admissions under Evid.R. 801(D)(2) is not persuasive.  Pursuant to Evid.R. 801(D)(2), a statement is not hearsay if it is:

> (a) [T]he party's own statement, in either an individual or a representative capacity, or (b) a statement of which the party has manifested an adoption or belief in its truth, or (c) a statement by a person authorized by the party to make a statement concerning the subject, or (d) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (e) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy.

---

[4] The prosecutor's argument was made outside the presence of the jury.  By way of background, although not admitted into evidence for the jury in this case, Detective Cutshall testified during the juvenile proceedings that J.A.C. told the detective that K.S. did not have a weapon, and that he was sitting on the window of the vehicle throwing gang signs. The detective further testified during the juvenile proceedings that the statements of J.A.C. and J.E.C. "do conflict." (Feb. 7, 2017 Tr. at 48.)

{¶ 92} As noted by the state, neither J.E.C. nor the detective is a party-opponent under the rule. *See, e.g., State v. Williams*, 7th Dist. No. 09 MA 11, 2010-Ohio-3279, ¶ 30, citing *State v. Ingram*, 12th Dist. No. CA2006-01-012, 2006-Ohio-4559, ¶ 8; *State v. McMannis*, 10th Dist. No. 01AP-413 (Dec. 4, 2001) ("a victim is not a party-opponent under Evid.R. 801(D)(2)").

{¶ 93} Appellant also contends the detective's summary of his interview with J.E.C. was admissible under Evid.R. 803(8), the hearsay exception for public records and reports. Evid.R. 803(8) permits the admission of hearsay consisting of:

> Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (a) the activities of the office or agency, or (b) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, unless offered by defendant, unless the sources of information or other circumstances indicate lack of trustworthiness.

{¶ 94} Prior to trial, appellant filed a motion in limine, raising the issue of the admissibility of police records under Evid.R. 803(8). During a hearing on January 4, 2018, the trial court ruled on the motion, finding Evid.R. 803(8) inapplicable, based in part on this court's decision in *Amoako-Okyere v. Church of the Messiah United Methodist Church,* 10th Dist. No. 14AP-441, 2015-Ohio-3841.

{¶ 95} In *Amoako-Okyere,* this court noted that "[g]enerally, '[a] police report is hearsay unless it meets one of the exceptions enumerated in the Rules of Evidence.' " *Id.* at ¶ 50, quoting *Muncy v. Am. Select Ins. Co.*, 129 Ohio App.3d 1, 5 (10th Dist.1998), citing *Petti v. Perna*, 86 Ohio App.3d 508, 513 (3d Dist.1993). In this respect, "[t]he firsthand observations of the official making the report fall within the public records exception to the hearsay rule and are admissible." *Id.* This court further noted, however, "hearsay statements contained in a police report that do not have an independent source of admissibility are inadmissible under Evid.R. 803(8)." *Id.*, citing *Cincinnati Ins. Co. v. Volkswagen of Am., Inc.*, 41 Ohio App.3d 239, 242 (10th Dist.1987).

{¶ 96} Here, the statements of J.E.C. lack an independent source of admissibility, and we find no error in the trial court's reliance on *Amoako-Okyere* in ruling on the admissibility of the subject records under Evid.R. 803(8). *See also State v. Houston,* 10th

Dist. No. 04AP-875, 2005-Ohio-4249, ¶ 28 (reversed and remanded in part on other grounds) (hearsay statements made by declarant to detective in police videotape not admissible under Evid.R. 803(8) as a public record or report).

{¶ 97} Appellant also challenges the trial court's exclusion of evidence that police investigators later found a weapon and bullet at the home of K.S., and that K.S. was charged with gun-related offenses subsequent to the events in this case. Appellant maintains such evidence tends to prove K.S. may have possessed the weapon used in the crime, that he had a familiarity with weapons, and that it speaks to his credibility.

{¶ 98} By way of background, the issue of subsequent weapons-related charges was first raised following voir dire of K.S. (during which he indicated his refusal to testify at trial). After voir dire was completed, defense counsel argued before the trial court (outside the presence of the jury) the following: "It's my * * * understanding that [K.S.] has new charges pending which are set, I believe, June 5th, Case No. 18JU-4405, aggravated robbery with a gun specific; 18JU-1399, a receiving stolen property, felony of the Fourth Degree also set on the same date * * *; 18JU-5017, assault, also pending, and pending charge on June 5th." (Tr. Vol. I at 85.) In response, the prosecutor represented that "[t]hose charges are subsequent to this, not part of the agreement. And they're -- again, they're juvenile pending cases, and they happened way after the Defendant's Agreement. They happened after the juvenile hearing * * *. So those would be completely separate and after the fact here." The trial court agreed with the state, finding that "those charges or indictments would not have been relevant" to the current proceedings. (Tr. Vol. I at 86.)

{¶ 99} Subsequently, during cross-examination of Detective Cutshall, the prosecutor objected to an inquiry by defense counsel as to whether the detective was aware that K.S. "has picked up additional gun charges." (Tr. Vol. III at 135.) Out of the presence of the jury, defense counsel argued the evidence was relevant because "we have no murder weapon. We have * * * two guns that have been confiscated. I have no idea whether or not he's been tested." The trial court sustained the objection, finding it speculative that subsequent weapons charges "could be relevant to the fact that a murder weapon wasn't found in this case." (Tr. Vol. III at 136.)

{¶ 100} Upon review, we find no abuse of discretion by the trial court in excluding testimony regarding pending gun charges brought against K.S. subsequent to the events at issue as speculative. *See, e.g., United States v. Zayac,* 765 F.3d 112, 118 (2d Cir. 2014) (trial court did not err in excluding, under Evid.R. 403, evidence of holster and magazine recovered from home of co-defendant where court determined there was a high risk "jury would engage in speculation," based on "chain of inferences," that co-defendant owned the gun and that this gun was the murder weapon, "since the holster was empty when it was recovered, the murder weapon was not found, and forensic testing had failed to establish * * * what kind of firearm was used" to kill victim).

{¶ 101} Based on the foregoing, appellant's third assignment of error is not well-taken and is overruled.

{¶ 102} Under the fourth assignment of error, appellant argues the trial court erred in allowing evidence that T.D. was the subject of intimidation at the time of trial. Appellant maintains this evidence should have been excluded as irrelevant, under Evid.R. 401, and as unduly prejudicial, under Evid.R. 403(A).

{¶ 103} The record indicates that T.D. was scheduled to testify on behalf of the state on the first day of trial (May 22, 2018). After the morning recess, and outside the presence of the jury, the prosecutor informed the trial court he had met with T.D. that morning, but that T.D. subsequently received a phone call in which he was informed "his grandmother's house had been shot up." (Tr. Vol. I at 93.) Detective William Best, who was in the prosecutor's office with T.D. at the time of the phone call, then testified on voir dire regarding the events of that morning. After T.D. received the phone call, Detective Best made arrangements for T.D. to be transported to his grandmother's residence. T.D. later informed the detective he refused to testify. The next morning (May 23, 2018), before resuming trial, the trial court conducted voir dire of T.D., at which time T.D. indicated his refusal to testify. The trial court found T.D. in contempt and ordered him taken into custody. Following a break, the trial court informed the parties that T.D. was now willing to testify, and he was then called as a witness by the state.

{¶ 104} Appellant contends the trial court erred in allowing T.D. to testify regarding events from the day earlier, including testimony that he received a number of phone calls from a "no caller ID," raising concerns that something could happen to him or

his family members.  (Tr. Vol. II at 16.)  Appellant also argues it was error for the court to permit testimony by T.D. regarding the phone call he received informing him that his grandmother's "house was shot up."  (Tr. Vol. II at 21.)

{¶ 105} Counsel for appellant objected to the prosecutor's inquiry about the phone call T.D. received the day earlier.  Outside the presence of the jury, counsel stated in part: "I thought we had specifically discussed the issue at hand, and it was my understanding that * * * we're not going to allow the State to get into the circumstances of everything that occurred before."  (Tr. Vol. II at 18.) The trial court, in addressing appellant's objection, noted the issue "presented yesterday was he was not going to testify, and the issue was whether or not we could present evidence as to why he wasn't coming."  The court further noted: "[t]oday the issue is he is here to testify and the credibility of his testimony whether there's bias, motive, that kind of thing is at issue."  The trial court deemed the questioning "relevant to those issues."  (Tr. Vol. II at 19.)

{¶ 106} This court has previously observed "there is no automatic and absolute exclusion of evidence that a witness fears retaliation, which evidence may be relevant to issues of credibility and bias." *State v. Battle,* 10th Dist. No. 18AP-728, 2019-Ohio-2931, ¶ 24, citing *State v. Hager*, 10th Dist. No. 93AP-260 (Feb. 8, 1994).  *See also State v. Gibson*, 8th Dist. No. 103958, 2016-Ohio-7778, ¶ 14, citing *People v. Mendoza*, 132 Cal.Rptr.3d 808 (2011) (evidence that a witness is reluctant to testify or fearful of retaliation "is admissible as relevant to the witness's credibility"); *State v. Hairston*, 10th Dist. No. 01AP-252 (Sept. 28, 2001) (contrary to defendant's contentions, questions by prosecutor regarding harassment, or fear of harassment, on the part of the state's witnesses "were relevant and admissible concerning the witnesses' credibility and possible bias in this case").

{¶ 107} In the present case, T.D. was a key witness to the events, and the defense challenged his credibility, seeking to portray him during opening statements as having "every incentive to lie" and, during closing argument, as having obtained a favorable deal from the state.  (Tr. Vol. I at 21-22.)   Here, the trial court could have reasonably determined that "testimony about his reluctance to testify in open court was relevant to his credibility and did not amount to unfair prejudice." *State v. Payne,* 8th Dist. No. 107825, 2019-Ohio-4158, ¶ 52 (trial court did not err in admitting testimony by witness

regarding his fear of retaliation after entering plea bargain as such evidence was relevant and not subject to exclusion under Evid.R. 403).

{¶ 108} Appellant's fourth assignment of error is not well-taken and is overruled.

{¶ 109} Appellant's fifth and sixth assignments of error are interrelated and will be considered together. Under these assignments of error, appellant asserts the trial court erred in the admission of social media messages and documents posted on Facebook, and in permitting the lead detective to testify regarding the contents of the Facebook web pages, in violation of Evid.R. 1002.

{¶ 110} Under the fifth assignment of error, appellant challenges the trial court's admission of state's Exhibit Nos. J-1 through J-12, containing social media content acquired from Facebook, Inc. Appellant contends that most of the exhibits, which included screenshots of appellant's Facebook account, were not authenticated. According to appellant, Detective Cutshall had no personal knowledge about the creation of these documents, but the trial court allowed him to testify about each exhibit. Appellant also challenges some of the exhibits as containing inadmissible hearsay.

{¶ 111} Under Ohio law, " '[t]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court.' " *State v. Padgette*, 8th Dist. No. 108525, 2020-Ohio-672, ¶ 7, quoting *State v. Sage*, 31 Ohio St.3d 173, 180 (1987). The "[a]uthentication of evidence is governed by Evid.R. 901(A)." *State v. McCarrel*, 10th Dist. No. 18AP-660, 2019-Ohio-2984, ¶ 35, citing *State v. Howard*, 1st Dist. No. C-170453, 2018-Ohio-3692, ¶ 14. Evid.R. 901(A) states: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."

{¶ 112} Evid.R. 901(B) "sets forth 'a list of illustrations that describe, without limiting, some ways in which evidence may be authenticated as required by Evid.R. 901(A).' " *McCarrel* at ¶ 36, quoting *State v. Moorer*, 9th Dist. No. 27685, 2016-Ohio-7679, ¶ 8. Pursuant to Evid.R. 901(B) "the authentication requirement can be satisfied by the '[t]estimony of [a] witness with knowledge' that 'a matter is what it is claimed to be.' " *State v. Caslin,* 10th Dist. No. 17AP-613, 2018-Ohio-5362, ¶ 20, quoting Evid.R. 901(B)(1).

{¶ 113} Ohio courts have recognized that "[t]his authentication standard is liberal and may be satisfied by either circumstantial or direct evidence sufficient for the trier of fact to conclude that the evidence is what its proponent claims it to be." *State v. Garcia-Toro,* 8th Dist. No. 107940, 2019-Ohio-5336, ¶ 30, citing *State v. Inkton*, 8th Dist. No. 102706, 2016-Ohio-693, ¶ 73. Further, "Ohio courts have also held that the determination of admissibility and authentication of social media evidence is 'based on whether there was sufficient evidence of authenticity for a reasonable jury to conclude that the evidence was authentic.' " *Padgette* at ¶ 13, quoting *State v. Gibson*, 6th Dist. No. L-13-1222, 2015-Ohio-1679, ¶ 41.

{¶ 114} With respect to photographs, "Ohio courts have held that a 'photograph is admissible if it is shown to be an accurate representation of what it purports to represent,' " and that " '[i]t is unnecessary to show who took the photograph or when it was taken, provided there is testimony that the photograph is a fair and accurate representation of what it represents.' " *Id.* at ¶ 12, quoting *State Farm Mut. Auto. Ins. Co. v. Anders*, 197 Ohio App.3d 22, 2012-Ohio-824, ¶ 30 (10th Dist.).

{¶ 115} At trial, the issue of Facebook postings arose during the testimony of T.D. and Detective Cutshall. T.D. testified that he used Facebook Messenger and that his screen name was "Ty Bod." He further testified that appellant's username on Facebook was "Jizzle Bod." (Tr. Vol. II at 25.) Over objection of defense counsel, T.D. identified the state's Exhibit No. J-1 as a Facebook communication he had with appellant on the date of the incident. T.D. further identified state's Exhibit No. J-4 as a message he sent to appellant that day at 4:37 p.m. T.D. identified state's Exhibit No. J-6 as a communication he had with appellant on the next day, February 13, 2016. T.D. testified that state's Exhibit No. J-5 was a news article he sent to appellant via Facebook, and he identified state's Exhibit No. J-2 as a photograph posted on appellant's Facebook account.

{¶ 116} As part of his investigation, Detective Cutshall obtained a search warrant for the Facebook accounts of several individuals, including appellant. At trial, he testified that state's Exhibit Nos. J-1 through J-12 contained screenshots of appellant's Facebook account. Detective Cutshall stated that appellant's username is "Jizzle Bod," as reflected in a Facebook printout identified as state's Exhibit No. J-1. (Tr. Vol. III at 87.) The detective identified each of the exhibits, including a photograph posted on Facebook of

individuals posing with gang signs (Ex. No. J-2), Facebook screenshots of conversations between appellant and T.D. on the date of the incident (Ex. Nos. J-3 and J-4), a news article posted on Facebook regarding the shooting incident (Ex. No. J-5), Facebook conversations between appellant and A.B. on the date of the incident (Ex. No. J-7), as well as conversations between appellant and C.W. on the date of the events (Ex. Nos. J-8 and J-9).

{¶ 117} Here, T.D. personally identified six of the Facebook exhibits, and testified that the exhibits included communications between himself and appellant on the date of the incident as well as the day after the shooting. We note that appellant acknowledges T.D. had personal knowledge regarding the creation of several of the Facebook messages. This court has found no abuse of discretion by a trial court in admitting exhibits of Facebook postings based on similar testimony, especially in light of the low threshold standard for authentication. *See State v. Ross*, 10th Dist. No. 17AP-141, 2018-Ohio-3027, ¶ 40 (testimony by witness that she was Facebook friends with defendant, that defendant responded to her messages, and that exhibits were pictures she took of Facebook posts made by defendant "sufficient for purposes of identification or authentication pursuant to Evid.R. 901"); *McCarrel* at ¶ 40 (testimony "was 'sufficient to meet the threshold admissibility requirement' of Evid.R. 901" where witness identified defendant's Facebook name and testified that screenshots admitted at trial were messages she sent defendant via Facebook, and where the content of the messages was consistent with the events at issue).

{¶ 118} Further, Detective Cutshall testified he obtained the Facebook account information through a search warrant, and he identified the exhibits at issue as Facebook screenshots from appellant's account. Ohio appellate courts "have found similar authentication evidence sufficient to meet the standard in Evid.R. 901(A)." *Garcia-Toro* at ¶ 30, citing *Inkton*; *Howard* (Facebook evidence properly authenticated where detective "testified that he obtained the Facebook evidence pursuant to a search warrant served on Facebook and personally reviewed the documents.").

{¶ 119} On review, we conclude the state presented sufficient evidence by which a reasonable juror could conclude the Facebook screenshots were authentic. We therefore find the trial court did not abuse its discretion in admitting the exhibits at issue.

{¶ 120} Appellant also argues some of the exhibits constituted inadmissible hearsay. Appellant provides only one example, citing a question by the prosecutor to Detective Cutshall concerning a posting in which A.B. asked appellant "who he's with." (Tr. Vol. III at 90.) As noted by the state, however, the question did not involve an assertion, and appellant's response would arguably have been deemed admissible as a non-hearsay admission by a party opponent under Evid.R. 801(D)(2)(a). *See, e.g., Inkton* at ¶ 90 (Facebook posting by appellant "admissible as a statement by a party-opponent" under Evid.R. 801(D)(2)(a)).

{¶ 121} Appellant further contends the trial court erred in permitting Detective Cutshall to testify that appellant and the other individuals in the vehicle posted news articles of the shooting on Facebook. Appellant maintains the court's ruling was in violation of Evid.R. 1002, the "best evidence rule."

{¶ 122} In response, the state argues the importance of Detective Cutshall's testimony referring to the news articles was the fact that the articles were sent, rather than the content of the articles themselves. The state maintains, therefore, the original was not required under an exception to the best evidence rule, i.e., Evid.R. 1004(4).

{¶ 123} We note that only one of the 12 social media exhibits admitted at trial pertained to a news article. Specifically, state's Exhibit No. J-5 included a news article that, according to the testimony of T.D., he sent to appellant via a Facebook post. Evid.R. 1002 states: "To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio." There are, however, "exceptions to that rule," including Evid.R. 1004(4). *State v. Winn,* 173 Ohio App.3d 202, 2007-Ohio-4327, ¶ 19 (2d Dist.). Evid.R. 1004(4) states: "The original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if * * * [t]he writing, recording, or photograph is not closely related to a controlling issue."

{¶ 124} Here, we agree with the state's argument that the purpose of Detective Cutshall's testimony regarding the article was not to prove the content of the article; rather, the import of the testimony was the fact the article was sent and, therefore, the article pertained to a collateral matter, i.e., not "closely related to a controlling issue."

Accordingly, the original was not required, nor has appellant demonstrated how the outcome of the trial was affected by this purported violation of the best evidence rule.

{¶ 125} Based on the foregoing, appellant's fifth and sixth assignments of error are not well-taken and are overruled.

{¶ 126} Under the seventh assignment of error, appellant asserts, relying on arguments raised in two prior assignments of error, he was denied effective assistance of counsel. Specifically, appellant argues his trial counsel was ineffective in failing to: (1) object to the prosecutor's closing argument, (2) assert a constitutional right to admit J.E.C.'s hearsay statements made to Detective Cutshall, and (3) rely on Evid.R. 803(8) as a basis for non-application of the hearsay rule with respect to Exhibit No. 7.

{¶ 127} In considering a claim of ineffective assistance, a trial counsel's performance "will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." *State v. Bradley,* 42 Ohio St.3d 136 (1989), paragraph two of the syllabus, following *State v. Lytle*, 48 Ohio St.2d 391 (1976); *Strickland v. Washington*, 466 U.S. 668 (1984). Further, in order to "show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Id.* at paragraph three of the syllabus.

{¶ 128} Appellant first argues his counsel was deficient in failing to object to the prosecutor's closing argument, asserting again that the prosecutor's reference to his demeanor during the custodial interrogation constituted an improper inference of the right to remain silent. However, in addressing appellant's second assignment of error, we found no error, plain or otherwise, as a result of the statements made during closing argument. Appellant has therefore shown neither deficient performance nor prejudice resulting from those comments.

{¶ 129} Appellant also raises a claim of ineffective assistance "to the extent" this court might find defense counsel "did not sufficiently argue that exclusion of the evidence" suggesting K.S. was the shooter violated appellant's constitutional right to present a defense. (Appellant's Brief at 43.) Appellant further contends trial counsel was

deficient in failing to raise Evid.R. 803(8) as a basis for non-application of the hearsay rule with respect to Exhibit No. 7.

{¶ 130} However, as noted by the state, defense counsel did raise a constitutional objection at trial with respect to the statements at issue, arguing before the trial court that "[appellant] has a constitutional right to present a defense that can trump local rules of evidence." (Tr. Vol. III at 111.) The record further indicates trial counsel raised an argument based on Evid.R. 803(8); specifically, counsel filed a pre-trial motion in limine, asserting that Evid.R. 803(8) "protects the defendant from the prosecution's use of self-serving law enforcement records and reports, while at the same time permitting defendant to use those reports as he deems fit, which includes admitting them into evidence." (Sept. 6, 2017 Mot. in Limine at 3.) Given that trial counsel raised the very issues appellant contends should have been presented, appellant cannot demonstrate deficient performance (nor does the record show prejudice).

{¶ 131} Based on the foregoing, appellant's seventh assignment of error is overruled.

{¶ 132} Appellant's eighth assignment of error raises a cumulative error claim. Specifically, appellant contends the cumulative effect of the errors raised under the previous seven assignments of error deprived him of his right to a fair trial.

{¶ 133} Under the doctrine of cumulative error, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner,* 74 Ohio St.3d 49, 64 (1995). However, in order to show cumulative error, "there must be a showing of multiple errors to cumulate, and '[w]here no individual, prejudicial error has been shown, there can be no cumulative error.' " *State v. Mendoza,* 10th Dist. No. 16AP-893, 2017-Ohio-8977, ¶ 86, citing *State v. Jones,* 2d Dist. No. 20349, 2005-Ohio-1208, ¶ 66. *See also State v. Owens,* 2d Dist. No. 17394 (Feb. 25, 2000) (The doctrine of cumulative error is "not applicable in instances where there is an absence of harmless and prejudicial error.").

{¶ 134} With respect to the preceding seven assignments of error, we have found no instances of error, and we therefore find the doctrine of cumulative error inapplicable.

{¶ 135} Appellant's eighth assignment of error is not well-taken and is overruled.

{¶ 136} Under the ninth assignment of error, appellant maintains his convictions for felonious assault on the bystander sisters, J.A.C. and J.E.C., are not supported by sufficient evidence and are contrary to the manifest weight of the evidence. Appellant asserts there is no evidence the shooter intended to injure the sisters or was aware his single gunshot would injure two or more individuals.

{¶ 137} In considering "a claim of insufficient evidence, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. McNight,* 107 Ohio St.3d 101, 2005-Ohio-6046, ¶ 70, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307 (1979).

{¶ 138} By contrast, the test for considering whether a conviction is against the manifest weight of the evidence "is much broader," whereby "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist.1983). Further, "[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶ 139} Appellant argues that, construing the evidence most strongly in favor of the state, appellant fired a single gunshot at K.W.; appellant maintains, however, there is no evidence he intended to injure the sisters (J.E.C. and J.A.C.), or that he was aware his single gunshot would injure two or three people. Apparently anticipating the state's response, appellant argues this case is distinguishable from this court's decision in *State v. Massalay*, 10th Dist. No. 15AP-544, 2016-Ohio-779. Appellant further argues, in the event this court finds *Massalay* not distinguishable, we should "overrule it." (Appellant's Brief at 47.)

{¶ 140} The offense of felonious assault is defined under R.C. 2903.11(A)(2), and states in part: "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2901.22(B)

states in part: "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist."

{¶ 141} In *Massalay,* this court addressed the issue of whether a single shot fired in the direction of more than one individual can support multiple felonious assault convictions. Specifically, under the facts of that case, the appellant was convicted of two counts of felonious assault based on evidence he fired a single shot at two police officers who, at the time of the event, were standing next to each other. On appeal, the appellant asserted the officers' testimony demonstrated it was "factually impossible for both officers to have been struck by the one bullet fired, and therefore appellant 'could not have been "aware that his conduct [would have] probably cause[d] a certain result," relative to the second victim.' " *Id.* at ¶ 35. The appellant argued, therefore, the state had "presented insufficient evidence on the 'knowingly' element of the second conviction." *Id.*

{¶ 142} In addressing the appellant's argument, this court initially rejected his claim "that it was factually impossible for both officers to be physically harmed by one shot." *Id.* at ¶ 38. Rather, we noted, "[t]he officers' testimony established that the semiautomatic rifle is a powerful weapon, and that the officers were in very close proximity to each other when the shot was fired, in such position to appellant that each officer believed the rifle to be aimed at him." *Id.* Significantly, this court held, the testimony established "that both officers were in the line of fire and at risk of injury by appellant's single shot," and therefore the evidence supported the "second conviction for felonious assault." *Id.*

{¶ 143} On review, we do not find persuasive appellant's attempt to distinguish *Massalay.* Rather, we find *Massalay* controlling on the issue of whether the evidence could support multiple convictions. In the present case, as in *Massalay,* there was sufficient evidence to support a finding that appellant was aware there were three individuals standing in close proximity when he fired the shot (from a moving vehicle), and that all three individuals were "in the line of fire and at risk of injury" by the single shot. *Massalay* at ¶ 38. *See also State v. Prater,* 10th Dist. No. 17AP-374, 2018-Ohio-932, ¶ 26 (citing cases upholding multiple assault convictions where evidence established

single shot fired by a defendant "toward multiple victims in the line of fire," and noting that "[e]ven if only one shot had been fired in [individual's] direction and that of the fleeing men, such evidence is not necessarily incompatible with multiple felonious assault convictions"); *State v. Ivory,* 8th Dist. No. 83170, 2004-Ohio-2968, ¶ 9 (proximity to drive-by shooting victim placed another "in the same line of fire"); *Robinson v. Lazaroff,* N.D.Ohio No. 1:15 CV 426 (Jan. 26, 2017) (adopting as Ohio law view that "anyone within the 'target range' in a drive-by shooting is 'in the line of fire' for purposes of a felonious assault charge"). Further, on review of the record, we do not find the jury lost its way and created a manifest miscarriage of justice in finding appellant guilty of felonious assault.

{¶ 144} Accordingly, we conclude appellant's convictions for felonious assault were based on sufficient evidence and were not against the manifest weight of the evidence.

{¶ 145} Appellant's ninth assignment of error is not well-taken and is overruled.

{¶ 146} Appellant's tenth and eleventh assignments of error are interrelated and will be considered together. Under the tenth assignment of error, appellant asserts the trial court erred in failing to merge Counts 2 and 3 (felonious assault) with Count 1 (murder). Under his eleventh assignment of error, appellant argues the trial court erred in failing to merge the improper discharge count with the other counts.

{¶ 147} R.C. 2941.25, Ohio's multiple count statute, states:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 148} In *State v. Ruff,* 143 Ohio St.3d 114, 2015-Ohio-995, the Supreme Court "established that the test for determining whether offenses are allied offenses of similar import requires the trial court to consider three separate factors: import, conduct, and animus." *State v. Collier,* 8th Dist. No. 108687, 2020-Ohio-3033, ¶ 34. Under this test, "[c]onvictions do not merge, and a defendant may be sentenced for multiple offenses if

any of the following are true (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus." *Id.*, citing *Ruff* at ¶ 25.

{¶ 149} In *Ruff,* the Supreme Court "provided two alternatives to determine whether the offenses are of dissimilar import: separate victims or separate harms." *State v. Carradine*, 8th Dist. No. 101940, 2015-Ohio-3670, ¶ 70. Specifically, the court in *Ruff* held that "two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff* at ¶ 26.

{¶ 150} Appellant, while acknowledging the holding in *Ruff* that offenses are of dissimilar import if they involve separate victims, reiterates his argument (made under the ninth assignment of error) that the two sisters (J.A.C. and J.E.C.) were mere bystanders and not victims. In addressing the previous assignment of error, however, we rejected appellant's contention that there was insufficient evidence to support the convictions for felonious assault involving J.E.C. and J.A.C. Here, because there are multiple victims with respect to the various charges, the trial court did not err in failing to merge the felonious assault counts with the murder count. *Ruff* at ¶ 26. *See also State v. Johnson*, 2d Dist. No. 26961, 2017-Ohio-5498, ¶ 35 (where felonious assault counts involve separate victims, the "harm for each is separate and distinct" and therefore trial court "did not err in failing to merge these offenses as allied offenses of similar import").

{¶ 151} Appellant further contends the trial court erred in failing to merge Count 4, discharging a firearm near prohibited premises, with Counts 1, 2 or 3 of the indictment. According to appellant, with respect to each pair of offenses, the conduct constitutes offenses of similar import. Appellant further argues the offenses were committed simultaneously (i.e., all offenses consist of the same conduct), and there was only a single animus with respect to each pair of offenses.

{¶ 152} R.C. 2923.162(A)(3) defines the offense of discharging a firearm and provides in part: "No person shall * * * [d]ischarge a firearm upon or over a public road or highway." We have previously noted the elements of felonious assault (i.e., no person shall knowingly cause or attempt to cause physical harm to another by means of a deadly weapon). The offense of felony murder, set forth under R.C. 2903.02(B), states in part:

"No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree."

{¶ 153} Ohio courts, in considering the harm caused by the offense of discharge of a firearm on or near prohibited premises, have held that "the language of R.C. 2923.162(A)(3) evinces an intent by the legislature that the discharge of a firearm on or near a public roadway causes resultant harm to the public even if no person or no structure is hit by the gunshots." *State v. Johnson*, 10th Dist. No. 18AP-889, 2019-Ohio-4265, ¶ 18, citing *State v. Williams,* 2d Dist. No. 27663, 2018-Ohio-1647, ¶ 24; *State v. James*, 8th Dist. No. 102604, 2015-Ohio-4987, ¶ 33.

{¶ 154} Thus, subsequent to *Ruff*, Ohio appellate courts have held that the offenses of improper discharge of a firearm and felonious assault do not merge. *See In re T.P.-A.*, 2d Dist. No. 28196, 2019-Ohio-2038, ¶ 18 (trial court did not err in failing to merge the offenses of felonious assault and improper discharge of a firearm where individual "was the victim of the felonious assault, and the public at large was the victim of the improper discharge offense"); *State v. Johnson*, 10th Dist. No. 16AP-860, 2017-Ohio-9286, ¶ 19 (trial court did not err in failing to merge offense of improper discharge of a firearm, which "offense occurs 'regardless of the presence of people,' " with felonious assault, "which requires a human victim"); *State v. Blanton,* 8th Dist. No. 107237, 2019-Ohio-1523, ¶ 13 (because convictions for attempted felonious assault of individual and discharging a firearm on or near prohibited premises "were committed against separate victims," i.e., the specific individual and the public at large, trial court properly found "they are dissimilar in import and not subject to merger under R.C. 2941.25"). Ohio appellate courts have similarly found, post-*Ruff*, that the offenses of discharging a weapon and murder are not subject to merger. *See State v. Williams*, 8th Dist. No. 107221, 2019-Ohio-794, ¶ 49 ("Pursuant to *Ruff* * * * the two offenses committed by appellant involved different victims, the victim of the murder offense was [the individual victim] while the victim of the discharging a firearm upon or over a public road or highway was the public at large," the latter offense posing "a great risk of harm to the public" that was "separate and differed in its significance from harm to a specific victim."); *State v. Shoecraft*, 2d Dist. No. 27860, 2018-Ohio-3920, ¶ 58 (trial court did

not err in failing to merge defendant's convictions for felony murder, felonious assault and discharge of a firearm on or near prohibited premises). Thus, the trial court did not err in failing to merge the offenses.

{¶ 155} Appellant's tenth and eleventh assignments of error are not well-taken and are overruled.

{¶ 156} Having overruled appellant's eleven assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BRUNNER and NELSON, JJ., concur.

_____